### 17539

G. Charlie JONES, Respondent, v. John S. COOPER, doing business
as Dixie Provision Company, Appellant
(109 S. E. (2d) 5)

*Messrs. Cooper & Gary, William A. Dallis* and *Frank K. Sloan,* of Columbia, *for Appellant,*

*Messrs. Law, Kirkland & Aaron, Henry W. Kirkland* and *Theodore W. Law, Jr.,* of Columbia, *for Respondent,* ▆▆▆

June 2, 1959.

Moss, Justice.

This action was brought by G. Charlie Jones, the respondent herein, against John S. Cooper, doing business as Dixie Provision Company, appellant herein, to recover

actual and punitive damages on account of alleged fraud and deceit arising out of a contract entered into between the respondent and appellant.

The complaint alleges that the respondent is a citizen of High Point, North Carolina, and that in the month of October, 1957, an advertisement by the appellant appeared in a newspaper published in said City of High Point, which read as follows:

"Supervisor: Man or woman earn $200.00 per week and up spare time, full time more. Servicing packaged food. Trade mark new sensational 'Pup in a Poke' accounts to chain store, dime stores, theaters, drive-ins, taverns, drug stores, schools, concessions, etc. No selling: accounts established by company. Permanent business, guaranteed income. Unlimited possibilities. You service accounts at your convenience $1,000.00 to $3,000.00 cash required 'Fully Secured'. Investment depends on size of territory you wish to start with. Complete assistance for unlimited expansion. For local interview and details, give phone number, write Box P-4, care Enterprise."

The complaint alleges that the respondent answered the above advertisement, and relying upon the same, entered into a contract with the appellant to purchase seven "hot-dog" cooking machines and two thousand five hundred cellophane bags used in the preparation, cooking and sale of hot-dogs. It is further alleged that an agent of the appellant represented to the respondent that the above mentioned machines would require servicing only one day a week, and that the appellant would be responsible for placing said machines in locations in the City of High Point. It is then alleged that the appellant delivered the said machines and sent a representative to the City of High Point for the purpose of securing locations for said machines. It is then alleged that the machines were located at "various negro establishments, all of which were among the poorest places of business in the City of High Point". The complaint alleges that the advertisement heretofore quoted was a fraud-

ulent misrepresentation, and that the appellant "did not intend to establish proper locations" for the cooking machines, and further "that the machines would require more time for servicing than was available to" respondent.

The appellant, by way of answer, denied all the allegations of the complaint charging him with fraud and deceit. He admits that the respondent purchased seven "hot-dog" cooking machines and a supply of bags for a total purchase price of $1,409.00; that the respondent signed a purchase and sales agreement ordering such and that thereafter the said seven cookers were placed in seven locations in and around the City of High Point; and that the respondent did, on November 13, 1957, certify in writing, that he had looked over the locations where the machines were placed and did "approve them as being satisfactory for me to start my business in. All agreements made between the Co. and myself and noted on the order have been completed as agreed".

This case was tried before the Honorable Legare Bates, Judge of the Richland County Court, and resulted in a verdict for the respondent for actual and punitive damages. The appellant made timely motions for a nonsuit and directed verdict, and after the rendition of the verdict, appellant moved for judgment *non obstante veredicto,* or in the alternative, for a new trial. All of these motions were denied. Timely notice of intention to appeal to this Court was given. The appellant has filed twelve exceptions, and for the purpose of the disposition of this appeal, we consider two questions: (1) Was there sufficient evidence of fraud and deceit to require the submission of this question to the jury? (2) Was the respondent barred from recovery by reason of the signing of a release and approval of the locations of the machines by the appellant?

The respondent in this case having charged the appellant with fraud and deceit as the basis of his cause of action must etasblish such by evidence that is clear, cogent and convincing, *Griggs v. Griggs,* 199 S. C.

295, 19 S. E. (2d) 477; and must prove all of the elements of fraud, and the failure to prove any one of them is fatal to recovery, *Able v. Equitable Life Assur. Society of United States,* 186 S. C. 381, 195 S. E. 652; *Mishoe v. General Motors Acceptance Corporation,* S. C., 107 S. E. (2d) 43, 49.

The respondent, in order to recover in an action for fraud and deceit, must allege and prove the elements thereof, which are as follows:

"(1) A representation; (2) its falsity; (3) its material-ity; (4) the speaker's knowledge of its falsity; (5) his intent that it should be acted upon by the person; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury." *Mishoe v. General Motors Acceptance Corporation, supra; Flowers v. Price,* 190 S. C. 392, 3 S. E. (2d) 38.

The testimony shows that the respondent is a native of, and has lived all of his life, in High Point, North Carolina. He is twenty-eight years of age, a graduate of High Point High School and had three years of college work at High Point College. The respondent is a salesman and has been so engaged for about four and one-half years. He testified that he saw the advertisement heretofore quoted in a newspaper published in High Point, and that he wrote a letter in response thereto stating that he was interested in the offer made. He advised that he was twenty-eight years of age, married and had two children, and had completed three years of college in Business Administration. He also stated that selling had been his career since leaving college in 1952, and was presently employed with the Clover Manufacturing Company of Norwalk, Connecticut, as factory representative in the Southeastern territory. To this letter the appellant replied and advised the respondent that one of its representatives would call upon him within a few days. It appears from the record that on October 28, 1957, a representative of the appellant visited the respondent at

his home in High Point. In this connection he testified as follows:

"A. Mr. Holiday came to my house on a Monday morning around eight o'clock and during the course of his sales talk he said that I would be dealing with one of the top companies in South Carolina, this same Cooper owns the Cooper Motor Lines and had given land for a golf course here in South Carolina to the City, and that they would only be hot dog machines—I'm just blank right now.

"Q. Did he suggest how much you could make out of it? A. Yes, he said I should go over $100.00 every week.

\* \* \* \* \*

"Q. Was Mr. Holiday the person to locate the machines, or did somebody else do that? A. He was going to send a 'Specialty' as he phrased it, and that was Mr. Harper.

"Q. Did Mr. Holiday tell you anything about how these machines were doing in other locations? A. Yes, he said that Mr. Harper here in South Carolina was very successful and that's how he got his job that he had then as a 'Specialty', that he had done so well with his machines.

\* \* \* \* \*

"Q. Did he lead you by his remarks, to believe that he had available, desirable locations or would have desirable locations? A. Yes, he did, and I also suggested some accounts at that time to him, too, such as Kress' in High Point, the five and ten store.

"Q. What was his answer to that? A. He said, well, Mr. Harper was a Specialty in that type of work and he would pick the better accounts out.

"Q. You had no reason to believe that these people weren't telling you the truth in this advertisement, and that Mr. Holiday wasn't telling you the truth, did you? A. I didn't."

The respondent testified as a result of the advertisement that he had seen in the newspaper and of the conversation he had with Mr. Holiday that he purchased, by written order, seven "hot-dog" machines and two thousand five hun-

dred special cellophane bags for $1,409.00. The order referred to contained the following:

"Company agrees to obtain locations for above order in following territory:

"High Point and surrounding areas. Under 'Pup in Poke' franchise accounts of seven secured and installed by company."

It further appears from the testimony that a representative of the appellant went to High Point on November 13, 1957. The seven machines and cellophane bags had already been received by the respondent. It further appears that the machines were uncrated and minor repairs were made to one of the machines by such agent of the appellant. All of this was done in the presence of the wife of the respondent. The wife testified that after the machines were uncrated, that the agent of the appellant took the machines and went out for the purpose of obtaining locations where they were to be operated. This agent returned to the home of the respondent on the same night and advised that he had succeeded in obtaining locations for all of the machines. This agent turned over to the respondent seven printed slips, one for each location. There was submitted to the respondent a locations list, giving the list of names and addresses of the business establishment which had entered into an agreement to permit the placing of the "hot-dog" machine on their premises. This location list showed that the respondent was to pay 35% of the sales to the establishment for the privilege of placing the machines on the premises. The respondent signed at the bottom of this list the following statement:

"I have looked over the above locations and hereby approve them as being satisfactory for me to start my business in. All agreements made between the Co. and myself and noted on the order have been completed as agreed.

"Signed G. Charlie Jones,

Operator."

The respondent testified that he came home on the night of November 13, 1957, and that Mr. Harper came to his home about 8:30. The following is the testimony thereabout:

"Q. That night when you got in did you see Mr. Harper? A. Yes, I did.

"Q. Had Mr. Harper located any machines? A. Yes, Mr. Harper came to my house about 8:30 and said that he had just finished securing the last account and that—he said he just started off and was going in circles, and finally he went to a taxicab stand and hired the services of a taxicab driver that was off work at that time and paid him $1.00 an hour to ride around with him to show him around town.

"Q. Did Mr. Harper then take you around to these locations or not? A. No, it was past 8:30 and I hadn't had dinner at that time.

"Q. When you accepted delivery you hadn't even seen the machines or locations? A. No, I hadn't.

"Q. You relied on these people entirely? A. That's right."

And again the respondent testified as follows:

"Q. Did Mr. Harper at your house that night, give you any sort of paper to sign? A. Yes, I asked him about the machines, that I never had seen one of those machines, and he said Mr. Holiday was supposed to have showed me how those machines worked, so he went out to the back of the car and got a machine that was broke and showed it to me, and he kept looking at his watch and wanted to get on back to Columbia, he said, and he showed me a list of the accounts and he said that was for the records in the office and that was all it was for and I signed it. I didn't even read it.

"Q. He said it was for the records in the Columbia office? A. Yes.

"Q. Did you read any of the printed matter? A. No, I didn't.

"Q. You took his word for it? A. I took his word for it.

"Q. I show you a printed slip filled out by Mr. Harper. Did Mr. Harper give you that slip? A. Yes, he did.

"Q. Is that for one of the locations? A. Yes, it is.

"Mr. Dallis: We have no objection to this paper." (Location Slip offered and received in evidence as Exhibit No. 11.)

"Q. Did Mr. Harper give you any other slips of this nature? A. Yes, he did.

"Q. Did you examine them carefully before he left? A. No. As I said before, it was getting late at night and I hadn't had dinner yet,· so I just hurriedly looked over them."

The respondent testified that he noticed a couple of the streets upon the location list were "colored streets" but that he didn't know what type of account was there until the following morning. He testified that the various establishments where the machines were located "bore a low reputation", and the day following the approval of the list he removed all the machines from the business establishments where they had been located by the appellant. He assigned as his reason that he would be afraid to go into that type of establishment to service the machines. The respondent also testified that he never actually serviced any of the machines by supplying them with "hot-dogs". He also admitted that he did not know whether the machines would produce $100.00 a week or not. The wife of the respondent testified in response to a question of whether she had heard Mr. Holiday inform her husband that he would have the right to approve the locations of the machines, "No, we didn't have a thing to do with it. We took for granted that he had surveyed High Point and had picked out the better accounts." After the machines had been removed from the locations, it appears that the respondent called the appellant and attempted to return the machines to him. This was refused on the ground that the respondent had made an outright purchase of the machines. The respondent did not deny that he was told by the appellant that they would assist him in obtaining more satisfactory locations for the machines

but he did not avail himself of this offer, nor did he make an effort to obtain other locations for the machines.

The respondent here is a college man and a salesman by trade. He signed the sales agreement and a written list approving the machine locations without reading either one. He describes the talk had by him with a representative of the appellant prior to the ordering of the machines as "sales talk". It is admitted that the machines purchased were as represented. There is no evidence in the record as to how often the machines would require servicing or how much the respondent might have earned from the operation thereof because the respondent did not leave the machines on location or service them in an effort to find out.

The advertisement that caused the respondent to contact the appellant cannot be construed to constitute fraud and deceit. The representation made in the advertisement was merely "dealer's talk" or "puffing". A careful study of the advertisement shows that it included nothing more than mere statements of opinion as to the possibilities of profit in connection with the "Pup-in-a-Poke" hot-dog machines. As a matter of fact the respondent testified that when a representative of the appellant came to see him, he described the interview and what was said as "sales talk". He further testified that the agent of the appellant suggested, in speaking of profits, "I should go over $100.00 every week." There is nothing in the advertisement that can be construed as supporting an action for fraud and deceit. This is particularly true because after a full and complete discussion by the respondent with the agent of appellant, a written contract was entered into. It is a recognized rule that a written agreement between two persons merges all prior talk and negotiations about the subject of the agreement.

In *Coleman v. Stevens*, 124 S. C. 8, 117 S. E. 305, 307, this Court approved the following:

"Deceit or fraudulent representation, in order to be actionable, must relate to existing or past facts, and the

fact that a promise made in the course of negotiations is never performed does not in and of itself constitute nor evidence fraud. A mere breach of a contract does not constitute fraud."

"A future promise is not fraudulent, unless such a future promise was part of a general design or plan existing at the time, made as part of a general scheme to induce the signing of a paper or to make one act, as he otherwise would not have acted, to his injury."

In the case of *Greer Bank & Trust Company v. Waldrop,* 155 S. C. 47, 151 S. E. 920, it appears that a bank induced a defendant to execute a note and mortgage to secure a past due note of her son by representing to her that she would not be called on for payment but that the mortgage would be used solely for the purpose of convincing the bank examiners of the solvency and financial worth of the note. It was held that the representations would have no probative value to show that the mortgage was obtained by fraud, because such statements related to promises as to future and not existing facts, and, therefore, could not be construed as false representations.

In the case of *Livingston v. Reid-Hart Parr Co.,* 117 S. C. 391, 109 S. E. 106, it was held that a representation that the seller would do a certain thing was nothing more than a promise, not the representation of a fact as existing, and the failure to make good that representation is nothing more than the breach of a promise.

The respondent asserts that the machines sold to him were to be placed in desirable locations, when the appellant, in fact, did not intend so to do. The contract offered in evidence by the respondent shows that the appellant had the right to obtain locations for the "hot-dog" machines. It performed this condition of the contract and submitted the list of locations to the respondent. The respondent approved the locations. There was no misrepresentation by the appellant on the locations it had obtained. The names and addresses of the locations obtained were submitted to the respondent,

and he, in writing, approved such locations. He was not misled nor was there any misrepresentation as to the locations.

If the respondent considered that the appellant had made any misstatements of fact to him as to the locations, he could have found out the truth. In *Mobley v. Quattlebaum,* 101 S. C. 221, 85 S. E. 585, and in *Whitman v. Seaboard Airline Ry. Co.,* 107 S. C. 200, 92 S. E. 861, L. R. A. 1917F, 717, and in *Flowers v. Price,* 190 S. C. 392, 3 S. E. (2d) 38, the rule is laid down that one cannot rely on the misstatement of fact if the truth is easily within his reach. In this case the truth was certainly within the reach of the respondent, and, therefore, he had no right to rely upon the representation made. However, in this connection it should be pointed out that the evidence conclusively shows that the appellant made no misstatements or misrepresentations as to the locations of the "hot-dog" machines.

Under the agreement between the parties it was the duty of the appellant to obtain the locations for the "hot-dog" machines. He performed this duty, which the contract invoked upon him and in the exercise of this legal duty no implication of fraud can arise. It was held in *Tolbert v. Roark,* 126 S. C. 207, 119 S. E. 571, that where one acts within his legal right, fraud will not be implied. See also *Waring v. South Carolina Power Company,* 177 S. C. 295, 181 S. E. 1, and *General Motors Acceptance Corporation v. Hanahan,* 146 S. C. 257, 143 S. E. 820.

It should be pointed out that in the advertisement heretofore referred to it was distinctly stated that the accounts would be established by the company, the appellant herein. This right was reserved to the appellant in the order placed with him by the respondent. The accounts were established by the appellant and were approved, in writing, by the respondent. It should be pointed out in this connection that the respondent cannot be classified as "ignorant and unwary". It was the duty of the respondent to read the contract that

he made with the appellant and to likewise read the locations list before signing same.

We do not think that the respondent offered any testimony to prove fraud and deceit in establishing the locations. However, assuming that the appellant did practice fraud upon the respondent, we think that this reckless disregard of his duty to avail himself of the opportunity and means at hand to protect his own interest precludes recovery. This Court has consistently followed the rule that one cannot complain of fraud in the misrepresentation of the contents of a written instrument signed by him when the truth could have been ascertained by reading the instrument, and one entering into a written contract should read it and avail himself of every opportunity to understand its content and meaning. *O'Connor v. Brotherhood of Railroad Trainmen*, 217 S. C. 442, 60 S. E. (2d) 884; *J. B. Colt Co. v. Britt*, 129 S. C. 226, 123 S. E. 845; and *Souba v. Life Ins. Co. of Virginia*, 187 S. C. 311, 197 S. E. 826.

The respondent also complains that the "hot-dog" machines would require more time for servicing than was available to the respondent. A review of the testimony shows that the appellant made no representation to the respondent as to how often the machines would have to be serviced. The record does reveal that all of the statements as to time available for servicing the machines were made by the respondent and his wife, to the effect that the respondent would be in town only one day each week. The only statement attributed to the appellant was that Mr. Harper advised Mrs. Jones that the machines should be serviced every other day, but this statement was made after the machines were purchased by the respondent. However, there is no evidence in the record as to how much servicing the machines would require because the respondent never permitted them to operate in order to determine servicing and sales requirements. There could be no consequent and proximate injury because of the statement made by the agent of appellant. The respondent never assigned as his reason for removing the ma-

chines from the locations that he was unable to service same, but that he removed the machines because he did not approve of the business establishments where the machines had been located by the appellant.

It is our conclusion that the representations made by the appellant were not actionable as fraud. The motion of the appellant for a directed verdict in the lower Court should have been granted.

For the reasons stated herein, the judgment of the lower Court is reversed and this case remanded in order that judgment may be entered up in favor of the appellant.

Reversed and remanded.

STUKES, C. J., and TAYLOR, OXNER and LEGGE, JJ., concur.