Gwin A. PIERCE, Sr., Plaintiff,

v.

NORTHWESTERN MUTUAL LIFE
INSURANCE CO., Defendant.

Civ. A. No. 77-1082.

United States District Court,
D. South Carolina,
Spartanburg Division.

Jan. 18, 1978.

George Brandt, III, and Ruth L. Cate, of Henderson, Lister, Couch & Brandt, P. A., Spartanburg, S. C., for plaintiff.

Wesley M. Walker, of Leatherwood, Walker, Todd & Mann, Greenville, S. C., for defendant.

## ORDER

HEMPHILL, District Judge.

Northwestern Mutual Life Insurance Company (NML) has moved for summary judgment on the basis that, as a matter of law, there are no substantial factual issues for determination, and that the plaintiff cannot prevail after an application of the law to the admitted facts. Since NML is the movant, all reasonable inferences, ambiguities, and conclusions, will be construed against it.

*Statement of Facts*

During the early 1970's, Gwin Pierce (Pierce) called the home office of NML, to express an interest in becoming affiliated with the company. The home office in turn called its area General Agent in Charlotte, North Carolina, and he thereafter called and went to see Pierce. During their discussions, it appeared that, perhaps, Pierce and his son, Gwin Pierce, Jr., both might become an agent for NML. Nevertheless, as it developed, the General Agent and Gwin Pierce, Jr. entered into a contract whereby Pierce, Jr. became a District Agent. At some time thereafter, and though neither the time nor the reason appears, Pierce, Jr. resigned as a District Agent.

Just prior to April 11, 1975, Pierce contacted the General Agent to discuss again the possibility of Pierce's becoming a District Agent for NML. Pursuant to this, on April 11, 1975 Pierce completed an application for a contract, and an actual contract, with the General Agent, and the contract was submitted to NML for approval, and it was approved. Before contracting with the General Agent, Pierce had been a life insurance agent for Mutual Life Insurance Company of New York for a brief period of time, and he then became a soliciting agent and, later, a district agent for Massachusetts Mutual Life Insurance Company. He had been with Massachusetts Mutual for a period of nine and one-half years, but he terminated employment with that company just prior to contracting as a District Agent for NML.

After Pierce became a District Agent in April 1975, he continually had difficulties with his General Agent relating to agents and training. These difficulties intensified in November 1976, and at that time Pierce started initiating direct contact with offi-

cials in the Agency Department of the home office of NML in Milwaukee, Wisconsin. Within two months, specifically, on January 10, 1977, the General Agent gave Pierce a notice of termination of his contract, effective February 10, 1977.

On February 23, 1977, the General Agent completed a "Request for Cancellation of Agent(s) or Adjuster(s)," a form prescribed and provided by the Licensing Division of the Department of Insurance, State of North Carolina. One of the blanks on that form required a "Reason for Cancellation," and the General Agent stated: "Failure to write sufficient business—would not follow guidance." This form was forwarded to NML, and on March 1, 1977 that form, along with a cover form from NML, was mailed to the North Carolina State Insurance Department for filing.

In his amended complaint, dated August 4, 1977, Pierce alleges two causes of action, one for defamation of character, and the other for breach of contract. He claims that the defamation was contained in the form filed with the North Carolina Insurance Commissioner, in the reason given for termination. He says that it was defamatory because he did follow guidance and did produce sufficient business. His claim for breach of contract is against NML also, even though he acknowledges that the General Agent, the individual with whom he initially contracted, was actually the one who brought about the termination and issued the notice.

On the defamation issue, NML submitted that, regardless of the truth of the statement, it was privileged and could not form the basis of an action because it was a mandatory filing, required by the North Carolina Department of Insurance, and on a form required by that department. NML also submitted that Pierce had failed to prove any publication of any defamatory statement. In addition to these assertions, NML said that it did not make the statement, but that it was made by the General Agent who is, by contract, an independent contractor, not an employee of the company.

On the issue of a breach of contract, NML submitted that, first, the contract was entered into and terminated by and between the General Agent and Pierce; and, second, that the contract specifically provided that it was terminable at will, by either party, without cause.

In response to NML's contentions, Pierce said that the official report did not enjoy an absolute privilege, but only a qualified privilege; that there was further publication of the defamation by virtue of a letter by the North Carolina Insurance Commissioner to Pierce's present employer, on September 19, 1977; and, that NML is bound by the General Agent's actions because he is an agent of NML pursuant to Section 38–51–10, Code of Laws of South Carolina (1976). In addition to those responses, Pierce alleged that, beginning in November 1976, and as a result of his discussions with officials in the home office, that NML, in effect, made a new contract with him by their assurances that everything would be taken care of. He does not specify what the new contract would be.

### Conclusions of Law

Each party has engaged in discovery, consisting of interrogatories, requests for admissions, and depositions. It would appear that the depositions are from those who would have the most direct and conclusive knowledge of what occurred in this situation. In addition to this discovery which has been carried on, the parties have attached various documents to pleadings and memoranda. On the basis of all of this, the court has concluded that Pierce cannot prevail on either of his causes of action, against NML, for the reasons stated hereinafter.

### Defamation

It is necessary to make some elementary statements on defamation or libel before making an application of these principles to the facts at hand.

The law of civil defamation attempts a balance between one person's right to speak

or write freely, without fear of civil liability, and another person's right to enjoy his reputation without defamatory attacks. 50 Am.Jur.2d Libel and Slander § 1, p. 512. "Language is defamatory if it tends to expose another to hatred, shame, obloquy, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons and to deprive him of their confidence and friendly intercourse in society." *Id.,* § 8, p. 520.

■ It is the function of the court, in the first instance, to determine whether a statement is susceptible of a defamatory meaning. *Jackson v. Record Publishing Co.,* 175 S.C 211, 178 S.E. 833 (1935). Furthermore, an alleged defamatory statement must be judged in the light of facts known to the person to whom it was addressed. It is not those facts which the parties themselves know which control, but rather the facts known by the person who receives the statement. See, *Klein v. Belle Alkali Co.,* 229 F.2d 658, 660, 662 (4th Cir. 1956), which held:

> While it is elementary that language relied upon as libelous must be judged in the light of facts known by those to whom it is addressed, it is well settled that its meaning cannot be enlarged or extended by an innuendo in the pleadings.

> \* \* \* \* \* \*

> Furthermore, since the injurious character of the publication and the harm done to the plaintiff depends upon the manner in which the writing is understood by those to whom it is uttered, it must be read and construed in the sense in which the reader would ordinarily understand it; and if, when thus considered, it cannot reasonably be interpreted as defamatory, it will not serve as a basis for the action.

Going beyond this, an alleged defamatory statement must be determined from the document or material as a whole, from beginning to end, and words cannot be singled out as libelous, but rather, the material must be libelous within the context of the complete writing. 50 Am.Jur.2d, *supra,* § 141, p. 643.

■ In addition to the first requirement that a writing be defamatory, there is the second requirement that it be published to a third party. Publication must be an intentional, or at least negligent, communication of the defamatory matter to someone other than the person defamed. It must be said so that it will, or may reasonably be expected to, reach a third person. *Riley v. Askin & Marine Co.,* 134 S.C. 198, 132 S.E. 584 (1926). Furthermore, even if a writing is defamatory, and it is published to a third person, the publication will be insufficient to maintain an action if it was invited or procured by the plaintiff or someone acting on his behalf. *Boling v. Clinton Cotton Mills,* 163 S.C. 13, 161 S.E. 195 (1931). One will not be allowed to induce, or instigate, a statement against him in order to achieve the requisite publication. *Taylor v. Jones Bros. Bakery,* 234 N.C. 660, 68 S.E.2d 313 (1951).

■ Tested against these elementary principles, Pierce's claim of defamation cannot stand. At the outset, the court is not persuaded that the alleged defamatory remarks are defamatory at all. They appear rather innocuous, especially when considered in the light of how they would be taken, understood, by the person receiving the publication, here, the North Carolina Department of Insurance. Obviously, that department is established for the regulation of insurance in the State of North Carolina, and the protection of its citizens. No reason appears why that department would have any interest in Pierce's production or ability to cooperate. The words used could hardly be considered libelous per se, since, at first impression they do not tend to degrade Pierce, that is, to "reduce his character or reputation in the estimation of his friends or acquaintances." *Lesesne v. Willingham,* 83 F.Supp. 918, 921 (D.S.C.1949). Nevertheless, that issue is not particularly significant here because the claim of defamation suffers other deficiencies.

■ It has been specifically held, in South Carolina, that a report in the nature of the one filed here with the North Carolina Insurance Commissioner, enjoys an absolute privilege. *Johnson v. Independent Life and Accident Ins. Co.,* 94 F.Supp. 959 (D.S. C.1951). But, here, the alleged defamation took place in North Carolina, and that state does not recognize an absolute privilege, but rather a qualified privilege. *Goforth v. Avemco Life Ins. Co.,* 368 F.2d 25 (4th Cir. 1966). Nevertheless, under facts, and words, much stronger than here, the *Goforth* decision held that, as a matter of law, the qualified privilege was established. When a report is required by a quasi-judicial agency or organization, the disclosures of the report are protected by at least a qualified privilege. In *Boston Mutual Life Ins. Co. v. Varone,* 303 F.2d 155, 158–159, (1st Cir. 1962), the court declared:

When a defendant has established that its publication was subject to a qualified or conditional privilege, the burden shifts to the plaintiff. It is commonly said that the plaintiff's burden is to prove malice. Malice, however, when used in this connection, is a word sometimes considerably misunderstood. . . . Essentially it means or requires an "improper motive," . . . "malicious motive," . . . an intent to "abuse the occasion" . . . To phrase this another way, it is an intent to do an act which goes beyond, or lies outside the purpose of the privilege.

Within this sense, the plaintiff cannot show ill will or malice here. At best, he could show no more than that he and the General Agent had been in several disagreements over the way to conduct an agency and, perhaps, that the reason given for his termination, on the official report, was not true, but this falls far short of proof of ill will or malice.

Several other elements are against the plaintiff in his defamation claim:

1. The official form was prepared, furnished, and required by the North Carolina Department of Insurance. If it had not been required, there is no reason to assume that it would have been filed.

2. Though the form was actually forwarded by NML to the Commissioner, there is no question but that the General Agent prepared the form, and even the administrative handling is the subject of a directive by the Commissioner, requiring all matters affecting agents to be handled by one office of a company.

3. There is no evidence that the Insurance Commissioner, or anyone in his office, actually read the termination notice, though it might be assumed that they did. Even so, there is no reason to assume that any person in that office who read the notice would have any particular thought about the reason given for Pierce's termination. One would assume that only another potential employer of Pierce would have any interest in his production or ability to follow guidance, and there is a total absence of any evidence that this reason for termination was ever communicated to anyone such as that. (Pierce is presently employed by another life insurance company. An Agency Manager for that company, on September 19, 1977, wrote to the North Carolina Insurance Commissioner to determine the reason for Pierce's termination with NML, and he was given the reason stated on the termination notice. The letter giving that information was filed by Pierce in this action, so that, obviously, the Agency Manager delivered it to him, which makes the incident appear somewhat contrived. Pierce had a copy of that termination notice before this action was begun; he could have given the Agency Manager a copy of it. No reason appears why the Agency Manager would wait several months after Pierce had become employed with the company, to write to the North Carolina Department of Insurance. In any event, this would not suffice for a publication of a defamatory statement because the information was requested; NML did not originate that request or have anything to do with the responses which were made.)

■ 4. Though not made an allegation of his complaint, Pierce claimed that he was additionally libeled by an Equifax report regarding him and his background. Exact-

ly how the Equifax report came to be does not appear clearly from the record. The contention is made that the report was requested from Spartanburg, South Carolina where Pierce presently works, as an agent under his son, who is a District Agent for Pierce's employer. From that, one might conclude that Pierce himself originated the request for an investigation by Equifax into his background, but that is not of any particular significance here. The Equifax report consists of a number of pages, but the alleged defamatory remark is found in a paragraph which begins at the bottom of the first page. Taken as a whole, that paragraph is rather complimentary to the plaintiff. The office giving the information which, presumably, was that of the General Agent for NML, in Charlotte, North Carolina, refused to furnish any information about Pierce's termination, saying that this was confidential. The report then states: "His former employer indicated that the subject had a satisfactory volume of personal production, estimated in the neighborhood of $500,000.00 annually." The claim is that this is defamatory because his personal production was more than that. (A follow-up investigation by Equifax revealed that his actual production, averaged for two years, would be $712,000.00 annually.) There are several reasons why the statement in the report cannot form the basis for a libel claim. A number of questions immediately arise. Who gave the information to the Equifax reporter? Was it given simply as an estimate, or did it purport to be an accurate statement? Was the person giving the information asked to look to verify the information and give it precisely? Did the Equifax reporter repeat the information exactly as it was given, or did he summarize someone else, using his own words? (If it were to develop that Pierce himself originated the request for the Equifax report, he would have no standing to complain about the answers which were received.)

5. In answering questions put to him by counsel for defendant, Pierce testified that his reputation was the same as it was before the alleged defamation, which would indicate that there was no damage to his character or good name. While it might be assumed that his being discharged would, somehow, taint his employment record, this assumption cannot be expanded to a conclusion of actual damage to his reputation, in the absence of some proof. That has not been done, even though there was an effort to show that he did not, immediately, receive positive responses from insurers, unnamed, to whom he made inquiry following his termination with NML.

*Breach of Contract*

The allegations of Pierce's Second Cause of Action are framed in such a way as to assert that the General Agent, in entering into the contract with Pierce, and later terminating it, was acting as an agent of NML, for the obvious reason that Pierce would have to prove that NML breached the contract, or he has sued the wrong party.

The contract itself is a part of the record. It has several provisions which are determinative here.

Paragraph 4 of the contract provides that the District Agent, Pierce, shall be an independent contractor, not an employee of the company or the General Agent. Paragraph 20 provides that it may be terminated by either party, at any time, without cause, upon thirty (30) days' written notice. Paragraph 21 provides that no renewal commissions are payable to a terminated agent who has less than two years of continuous service. Paragraph D, on page 4 of the contract, purports to be the only agreement between the company and the District Agent, and it states that the company shall not be liable to the District Agent in any manner except as set out in that particular endorsement, none of which would appear to apply here.

■ As with the issue of defamation, there is no substantial controversy over the facts. The contract which was entered into between the General Agent and Pierce, about April 11, 1975, was a form contract prepared and furnished by NML. By the

same token, it appears that all contracts, for all categories of agents, are prepared and furnished by NML. The agency procedure is such that the home office Agency Department contracts with General Agents in various parts of the United States. These General Agents, in turn, contract directly with District Agents, and the District Agents contract directly with Soliciting Agents. A face page of each of these categories of contracts was made a part of the record in this case. In each instance, the contract provides that it is being entered into by two distinct categories of individuals, so that, in every instance, a District Agent contracts his own Soliciting Agents; a General Agent contracts his own District Agents; and, NML contracts its General Agents. Each category of contract provides that the agent being contracted is an independent contractor, not an employee of the company. NML maintains an agency system which makes each agent an independent contractor—each man his own boss—rather than having all agents as employees of the company. This would be distinguished from a company in which every agent, regardless of his category, would be an employee of the company. The essential element is one of control, or the right to control, a person in the manner in which he conducts his business, and it would appear that NML does attempt to maintain the integrity of its agency system. There is no competent evidence here to contravene the contract's claim that both the General Agent and Pierce were independent contractors. The independent contractor status is borne out by several factors, including, among other criteria, the following:

(a) A General Agent or District Agent selects, rents, and furnishes his own office space, sets his own hours of work, and chooses his own methods of conducting the solicitation of insurance business.

(b) A General Agent or District Agent hires clerical personnel and is fully responsible for the supervision and expenses of clerical personnel.

(c) A General Agent contracts with and terminates District Agents and Special Agents. A District Agent contracts with and terminates Soliciting Agents.

(d) A General Agent's or District Agent's income is dependent upon his personal solicitation efforts and upon the efforts of agents contracted to him, and he is in the position of realizing a profit or loss from the manner in which he selects, trains and supervises the efforts of agents contracted with him.

(e) A General Agent or District Agent invests money to finance his agency and pays his own general operating expenses, including advertising, entertainment, training, and sales and educational materials.

(f) A General Agent or District Agent files declarations of estimated income, and accounts for his own income taxes rather than the taxes being withheld by NML.

(g) NML does not become involved in workmen's compensation, unemployment compensation, or payroll deductions, except for the collection of social security taxes because of a special statutory provision affecting insurance agents.

(h) NML does not pay expenses for the General Agent or the District Agent who attends an Agents' Annual Meeting in Milwaukee. The expenses are paid by the General Agent and the District Agent themselves, although in some cases the General Agent will pay some expenses for his District Agent.

(i) Each group of agents—general, district, special and soliciting—has an association, and each association has officers. These associations handle matters of interest to the agents, including such things as group disability insurance.

(j) A General Agent determines the territory within which the District Agent may operate, but within that area the District Agent decides the manner in which he will recruit, train and develop.

The facts show that Pierce and his son contacted NML in the early 1970's with the idea that both of them would become affiliated with that company. Later, the son did become a District Agent (although he later resigned), but Pierce stayed with Massachusetts Mutual, where he was either already, or thereafter became, a District Agent. Then, apparently, in early 1975, Pierce recontacted the General Agent, again with the thought of going with NML and, after discussions, the General Agent and Pierce entered into a contract. It does not appear that Pierce conducted any discussions or negotiations with the home office of NML regarding his becoming a District Agent under the General Agent. It does appear, however, that the Director of Agencies for NML, in discussions with the General Agent, recommended against contracting with Pierce. Nevertheless, even though the home office, pursuant to the various contracts, has the right of approval of an agent, it did not exercise this right to veto the contract entered into with Pierce. After the contract was entered into, Pierce and the General Agent were apparently able to operate together on some basis, even though often at odds, up until about November 1976 when, for the first time, Pierce initiated discussions with officials in the home office.

The controversy between Pierce and the General Agent intensified to the point that on January 10, 1977 Pierce was given a 30 day notice of termination, pursuant to the contract requirement. In his complaint, Pierce says that even though he performed the contract, the defendant breached the contract in that "he" hindered, interfered, encouraged employees to be uncooperative, dealt with employees behind his back, and failed to provide training. In each of these regards, Pierce is talking about the General Agent. Pierce then says that the defendant wrongfully terminated his contract, and even though it was terminable at will, that there was a good faith duty not to terminate without just reason. Those claims are directly contrary to the provision of his contract, and they are also contrary to the law affecting contracts.

The contract unquestionably provides that it is terminable at will, without cause, upon 30 days' notice, and this procedure was followed by the General Agent in terminating Pierce's contract. The contract itself provides that it is to be interpreted according to the laws of the State of Wisconsin, and though a reference to a case from that jurisdiction is informative, it presents no different law from the general law of other jurisdictions. In *Matthew v. American Family Mutual Ins. Co.,* 54 Wis.2d 336, 195 N.W.2d 611 (1972), an order granting summary judgment in favor of an insurer, and against a terminated agent, was upheld, the court ruling that since the contract, by its provisions, could be terminated at will, the agent's claims of fraud and personal hardship were immaterial. See also, *Inabet v. Pan American Life Ins. Co.,* 267 So.2d 774 (La.App.1972). In *Wright v. Southwestern Life Ins. Co.,* 364 F.Supp. 981 (W.D.La.1973), the court upheld the termination of the agent even though he had invested a great deal of time and money in the development of a market, just as Pierce claims here. Regarding the provision of the contract that it was terminable at will, the court said:

> Indisputably, the contract was terminated . . . in accordance with the terms of the contract for dismissal without cause. No case has been brought to our attention, nor do we know of any, which forbids one party under a contract such as this from terminating it after notice.
>
> \*　\*　\*　\*　\*　\*
>
> As amply demonstrated by plaintiff's evidence, the return on his investment of time was substantial. Obviously, his return would have been greater had he continued as a Southwestern agent; however, the contract to which he voluntarily agreed provided exactly for the termination of which he now complains. . . . We cannot permit him to avoid the clear and unequivocal terms of that contract.
>
> \*　\*　\*　\*　\*　\*

While we hold strong empathy for plaintiff's contention, we cannot make that feeling the basis of a decision in his favor here, where the terms of the contract he entered into with Southwestern dictate otherwise.

 To avoid the provision of his contract that it was terminable at will, without cause, Pierce says that he and the General Agent discussed this at the time he entered into the contract, and he indicates that the General Agent apparently told him that, regardless of that provision, he "feels like" it is necessary to have cause to terminate somebody. The exact import of that statement is not clear, and the language relied upon is confusing in itself, but that obviously took place prior to the contract being entered into, and the written terms of the contract would govern, regardless of any discussions which the General Agent and Pierce may have had prior to the time of formalizing the contract. *Gantt v. Van der Hoek*, 251 S.C. 307, 162 S.E.2d 267 (1968); *Jones v. Cooper*, 234 S.C. 477, 109 S.E.2d 5 (1959). (Pierce should have been familiar with the termination-without-cause procedure. He had left two previous companies, at the time he wished, without their having any continuing restraint against him. By the same token, his son had apparently terminated a District Agent's contract with the same General Agent. This would indicate that there was nothing unusual, or unknown, in the procedure for termination at will, except that on this occasion it happened to Pierce, rather than at his volition.)

In two or more places in his second cause of action, Pierce mentions the concepts of good faith/bad faith and wrongful termination. Yet, the courts have consistently held that unless the claim is actually fraud, or breach of contract accompanied by a fraudulent act, a consideration of motive or intent is immaterial. See, *Holland v. Spartanburg Herald-Journal Co.*, 166 S.C. 454, 165 S.E. 203 (1932); *Calder v. Commercial Casualty Ins. Co.*, 182 S.C. 240, 188 S.E. 864 (1936); *Roberts v. Fore*, 231 S.C. 311, 98 S.E.2d 766 (1957); and, *Ward v. Liberty Life Ins. Co.*, 232 S.C. 582, 103 S.E.2d 48 (1958).

 As a final effort to salvage his breach of contract action, and even though the claim is not even mentioned in his complaint, Pierce subsequently claimed that, beginning with his calls to the home office in November 1976, he received assurances that everything would be taken care of, or that his contract would be protected in some manner. He says that this amounted to a new contract, and that the consideration was his keeping the company advised of his difficulties with the General Agent. This does not begin to come close to meeting the requirements for a contract. The essentials of a contract are an offer, an acceptance, and valuable consideration. None of these elements is present. What was the offer? Was it an implied one, from Pierce, that he would furnish information to the home office, about the General Agent, if NML would make a new contract with him? Was it an implied one from the home office of NML that if Pierce would furnish information, that they would continue his existing contract? None of the evidence admits to such a construction.

While it is not important to a consideration of this matter on summary judgment, the assertions made by Pierce are categorically denied by the only two officials in the home office with whom Pierce discussed the difficulties with the General Agent. Aside from that, however, Pierce has made no effort to show what the "new" contract was. It is obvious from even a quick review of the contract between him and the General Agent that the document they used would not suffice for a direct relationship between Pierce and the home office, and of course that arrangement would have been totally contrary to the whole agency set up which has been described heretofore.

 A written contract may be modified by a subsequent parol agreement, supported by valuable consideration. *American Oil Co. v. Cox*, 182 S.C. 419, 189 S.E. 660 (1937). This rule would not apply here, however, for the reason that the contract was between Pierce and the General Agent, not between Pierce and NML, and to sus-

tain Pierce's contention, it would have to be concluded that NML modified the Pierce-General Agent contract. Beyond this, there was no valuable consideration for a new or modified contract.

Pierce says that the "valuable consideration" was the expense he incurred in furnishing copies of letters, and in making telephone calls, to the home office. While his correspondence is not made a part of the record, this presumably took place, along with the telephone calls, while his contract with the General Agent was still in existence, and these actions, logically, would have been taken to protect his position under that contract, with the hope that it would not be terminated. There is nothing to indicate that Pierce ever envisioned a new, separate, and independent contract between himself and NML directly. To the contrary, it was his specific understanding that NML would not do that. At best, he only hoped that home office officials would direct the General Agent not to terminate his contract. This, of course, did not occur and, essentially, that is the basis of Pierce's grievance here. Yet, vague discussions and assurances cannot give the requisite body to a formal contract. Therefore, the conclusion must be drawn that the only contract in issue was that between the General Agent and Pierce, and the General Agent terminated it pursuant to its terms. It certainly occurs that inequities are realized in contractual relationships, and it may be that Pierce's expectations were frustrated by continual disagreements with his General Agent, but parties must accept the consequences, good or bad, of those contracts which they voluntarily make.

IT IS THEREFORE ORDERED that summary judgment be granted in favor of the defendant and against the plaintiff as to both of his causes of action, and the plaintiff's complaint is dismissed with prejudice.

IT IS SO ORDERED.