977 F.2d 575
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Julian R. YOUMANS, Individually and as Former Director and
Liquidating Trustee of Francis Marion Hotel, Incorporated, a
Dissolved South Carolina Corporation, and as Successor to
Francis Marion Hotel, Incorporated, a Dissolved South
Carolina Corporation; Reed N. Youmans, as the Former
Director and Liquidating Trustee of Francis Marion Hotel,
Inc., a Dissolved South Carolina Corporation; Francis
Marion Hotel, Incorporated, a Dissolved South Carolina
Corporation, Plaintiffs-Appellees,
v.
The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant-Appellant,
and
Hospitality Associates of Charleston; Martin Hecht;
Jeffrey Stoler, Defendants.
 Nos. 91-2552, 91-2554.
 United States Court of Appeals, Fourth Circuit.
 Argued June 1, 1992.
Decided Sept. 28, 1992.
 
 Appeals from the United States District Court for the District of South Carolina, at Charleston, No. CA-88-1258-2-18; Falcon B. Hawkins, Chief District Judge; David C. Norton, District Judge.
 Argued: Jay D. Bennett, Alston & Bird, Atlanta, Ga., for appellant; Patrick Michael Duffy, McNair Law Firm, P.A., Charleston, S.C., for appellees.
 On Brief: Richard R. Hays, Alston & Bird, Atlanta, Ga., Thomas S. Tisdale, Jr., Michael A. Molony, Young, Clement, Rivers & Tisdale, Charleston, S.C., for appellant; Michael A. Scardato, McNair Law Firm, P.A., Charleston, S.C., for appellees.
 D.S.C.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 Before ERVIN, Chief Judge, and K.K. HALL and MURNAGHAN, Circuit Judges.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 Dr. Julian Youmans owned the Frances Marion Hotel (Hotel) in downtown Charleston, South Carolina in the corporate form of Francis Marion Hotel, Inc. (FMH, Inc.). Youmans sold the Hotel to Hospitality Associates of Charleston, Inc. (HAC), Martin Hecht and Jeffrey Stoler, general partners, in 1979 for $10,050,000. Of this amount, $6,000,000 was in the form of a first mortgage by Prudential Insurance Corporation of America (Prudential), and $2,550,000 was in the form of second and third non-recourse mortgages financed by Youmans. After about a year, HAC began having trouble making its mortgage payments to Prudential, and Prudential negotiated a "workout agreement" with HAC in which Prudential agreed to forebear payments for six months. HAC kept Youmans' mortgages current, however, so he would not call a default. HAC then breached the workout agreement. Prudential at that point sent Youmans a letter informing him, for the first time, that HAC was in default. Prudential foreclosed on its mortgage, but the proceeds were insufficient to pay Youmans anything on his subordinate notes.
 
 
 2
 Youmans brought suit in the District of South Carolina under the court's diversity jurisdiction, maintaining that Prudential had agreed to inform him of any defaults by HAC when they first occurred, i.e., at the time of the workout agreement. The jury awarded Youmans $100,000 for breach of contract by Prudential, $1,000,000 for negligence by Prudential and $500,000 in punitive damages. The jury found against Youmans on his claims of fraud and breach of contract accompanied by fraud.[1] The district court directed a verdict in favor of Prudential on Youmans' conspiracy claim. Prudential appeals the contract and negligence awards on the ground that the court erred in refusing to grant judgment notwithstanding the verdict (JNOV) in its favor, and Youmans cross-appeals the directed verdict on the conspiracy claim. We hold that the court erred in refusing to enter JNOV on the contract and negligence awards, and thus reverse these judgments,[2] and we affirm the court's directed verdict on the conspiracy claim.
 
 I.
 
 3
 In 1979, Youmans purchased the Hotel, which has 254 rooms and was constructed in 1924. He entered into a purchase agreement with HAC on September 19, 1984, agreeing to sell the Hotel for $10,050,000.[3] Of this amount, HAC agreed to pay FMH, Inc. $7,500,000 in cash--$6,000,000 in proceeds from a first mortgage issued by Prudential (for which HAC was required to make monthly mortgage payments of $72,000 to Prudential) and $1,500,000 from limited partner investors. HAC agreed to execute two non-recourse promissory notes in favor of FMH, Inc. for the balance of the purchase price. The purchase agreement incorporated by reference the commitment letter HAC subsequently obtained from Prudential.
 
 
 4
 On October 26, 1984, Prudential approved HAC's loan application and issued the commitment letter agreeing to make a $6,000,000 loan. Between Martin Hecht and Jeffrey Stoler and Prudential there were some social and business connections, including the fact that Hecht and Stoler managed a number of Prudential hotels. Youmans, through HAC, negotiated for a provision (hereinafter, "section 9(e)") that was included in the commitment letter:
 
 
 5
 The Mortgaged Premises shall not be encumbered by any secondary or subordinate liens, except for a second mortgage loan in the original principal amount of $2,550,000, and a third mortgage loan in the original principal amount of $1,000,000, the second and third mortgage both having a term of seven years and with all interest accrued and not due during the first two years.... Prudential also agrees as follows:
 
 
 6
 (i) that, in the event of a monetary default under the Prudential first mortgage, Prudential will allow the second or third lienholder the right to bring the first mortgage current within 30 days of written demand therefor by Prudential; and
 
 
 7
 (ii) that, in the event the second or third lienholder forecloses or takes a deed in lieu of foreclosure, such event will not cause an exercise by Prudential of its rights under the due on sale clause contained in the Prudential first mortgage.
 
 
 8
 Section 9(e), J.A. 2019-20.
 
 
 9
 On December 12, 1984, HAC, FMH, Inc., and Prudential attended a day-long closing to transfer ownership of the Hotel. All three parties were represented by counsel and each had the opportunity to review all documents. HAC and Prudential closed the first mortgage, which included the following provision:
 
 30. Actions by Mortgagee:
 
 10
 a. Without affecting the liability of Mortgagor or any other person (except any person expressly released in writing) for payment of any indebtedness secured hereby or for performance of any obligation contained herein, and without affecting the rights of Mortgagee with respect to any security not expressly released in writing, Mortgagee may, at any time and from time to time, either before or after the maturity of said Note, and without notice or consent:
 
 
 11
 i. Release any person liable for payment of all or any part of the indebtedness or for performance of any obligation.
 
 
 12
 ii. Make any agreement extending the time or otherwise altering the terms of payment of all or any part of the indebtedness, or modifying or waiving any obligation, or subordinating, modifying or otherwise dealing with the lien or charge hereof.
 
 
 13
 J.A. 2091. The mortgage did not contain the section 9(e) language of the commitment letter, and it included a number of other modifications of the commitment letter as well.
 
 
 14
 Two escrow agreements were also executed at closing, one among Prudential, FMH, Inc., and HAC for $950,000 to be set aside to guarantee payment of the Furniture, Fixtures & Equipment lease, the other among Prudential, HAC, and a bank as Ramada Inn's agent for $150,000 to be set aside to pay Ramada's franchise fee. Both agreements included, in the recitals, the statement:
 
 
 15
 WHEREAS, Lender [Prudential], pursuant to its Loan Commitment dated October 26, 1984 (the "Commitment"), agreed to disburse the principal sum of Six Million Dollars ($6,000,000.00) ("the Loan") to Borrower [HAC] to finance Borrower's acquisition of the Hotel, upon the terms and conditions set forth therein....
 
 
 16
 J.A. 2536, 2544.
 
 
 17
 HAC and FMH, Inc. also executed the second and third purchase money mortgages. FMH, Inc. acknowledged in these mortgages that they were inferior to Prudential's first mortgage. These mortgages included a cross-default clause, whereby HAC's default of another mortgage would constitute a default of its notes to FMH, Inc., and they required HAC to notify FMH, Inc. if such a default occurred. The mortgages also included a provision allowing FMH, Inc. to cure HAC's obligations on any mortgage should it choose to do so.
 
 
 18
 In November 1985, almost a year after closing, HAC notified Prudential that it would have problems meeting its obligations under the first mortgage. HAC and Prudential representatives met in January 1986 to devise a workout agreement. The parties later worked out the details: HAC would try to raise an additional $1.5 million in equity from investors; Prudential would forebear on mortgage payments for six months; HAC would agree not to contest foreclosure; and HAC would agree to defer payment of management fees and repayment of loans to its general partners from Hotel proceeds.[4] HAC made six months' payments beginning in June 1986. HAC then missed four more payments, January through April 1987; it made the May 1987 payment; and then it missed the June 1987 payment. At that time, Prudential decided that HAC's violations of the workout agreement constituted "unacceptable default." J.A. 2238.
 
 
 19
 During the time of the workout agreement, HAC apparently made false statements to FMH, Inc. that it was solvent, and it paid interest on FMH, Inc.'s notes so that FMH, Inc. would not call a default on those notes. Prudential knew, but apparently disapproved, of the fact that HAC was paying Youmans' notes, since Prudential sent HAC a letter on April 20, 1987 demanding that HAC's payments to the secondary lienholder cease until Prudential's loan obligations had been made current.
 
 
 20
 Not until late September 1987 did a Prudential attorney inform Youmans of Prudential's attempt to foreclose on the Hotel, which was apparently the first Youmans had heard about HAC's problems with the first mortgage or the Hotel generally. Prudential's letter of October 5, 1987 to Youmans stated that the "reinstatement figure" as of October 1, 1987 was $1,300,000. J.A. 2248. Youmans' total cost to cure at that point would have been closer to $2,000,000, including penalties, attorneys' fees and participation fees. Prudential gave Youmans 24 days to come up with a proposal before it filed its foreclosure papers. Youmans decided that it was "commercially unreasonable" to pay the full arrearage, J.A. 519, and he did not cure the default or purchase the Hotel at the foreclosure sale. Prudential did purchase the Hotel at foreclosure, although for less money than it was owed by HAC. Youmans therefore received nothing on his subordinate mortgages. Prudential apparently discovered a major asbestos problem at the Hotel and ultimately closed it down.
 
 II.
 
 21
 Our task in a diversity case such as this one is to apply the operative state law as would the highest court of the state in which the suit was brought. We therefore must interpret the agreements in this case as would the South Carolina Supreme Court. See Liberty Mutual Ins. Co. v. Triangle Indus., 957 F.2d 1153, 1156 (4th Cir.1992).
 
 
 22
 The question we must answer in deciding Prudential's motions for JNOV is whether there is evidence on which a jury could properly have based its verdicts for Youmans on each claim. Lust v. Clark Equip. Co., 792 F.2d 436, 437 (4th Cir.1986). If, resolving all factual disputes in favor of Youmans, we conclude that Prudential is nevertheless entitled to judgment as a matter of law, JNOV is required.
 
 A.
 
 23
 Youmans' argument supporting the jury's breach of contract verdict is that section 9(e) of the October 26, 1984 commitment letter between Prudential and HAC was included for Youmans' benefit. Youmans contends that section 9(e) required Prudential to notify Youmans in a timely fashion of any HAC default in the first mortgage and to allow Youmans the opportunity to cure the default. Youmans maintains that Prudential breached this contractual duty by not notifying Youmans until September 1987 of HAC's default, even though HAC had first defaulted in November 1985. Youmans argues that this delay was damaging to him because, by virtue of Prudential's delay in serving notice, the costs to cure HAC's default and take over ownership of the property became prohibitive, and as a result he lost all value in his notes.
 
 
 24
 As an initial matter, Youmans is correct that he is an intended third party beneficiary of the section 9(e) language in the commitment letter. See Wise v. Picow, 101 S.E.2d 651, 655 (S.C.1958). Youmans negotiated for the provision, and the language was clearly included for his benefit. Youmans is entitled to sue on this asserted obligation. See 17A Am.Jur.2d Contracts § 456 (1991) (third party beneficiary's act of suing on contract sufficient to constitute acceptance of and thus convey rights under contractual promise). Further, Youmans has at least an arguable claim that the section 9(e) language required timely notice. According to section 9(e)(i), "[I]n the event of a monetary default under the Prudential first mortgage, Prudential will allow the second or third lienholder the right to bring the first mortgage current within 30 days of written demand therefor by Prudential." J.A. 2020.
 
 
 25
 However, interpretation of the language of the commitment letter is not necessary to the resolution of this case. Youmans concedes that the final documents executed at closing did not include the section 9(e) language and that Prudential did not agree in any other provision to provide Youmans with notice. Youmans must therefore argue that section 9(e) of the commitment letter survived closing and remained part of Prudential's contractual obligations during the life of its mortgage with HAC.
 
 
 26
 The South Carolina Court of Appeals considered and rejected a similar claim in Wilson v. Landstrom, 315 S.E.2d 130 (S.C.App.1984). In Wilson, a seller maintained that a provision of the mortgage her agent signed on her behalf was directly contradictory to and therefore breached a previous contract between the seller and buyer. The court held, however, that "[t]he deed and mortgage delivered and accepted at closing, not the prior contract, represented the final bargain of the parties." Id. at 132. The court based its ruling on the South Carolina Supreme Court's decision in Charleston & Western Carolina Ry. Co. v. Joyce, 99 S.E.2d 187 (S.C.1957). The Joyce court first noted that " '[t]he doctrine of merger is founded upon the privilege, which parties always possess, of changing their contract obligations by further agreements prior to performance.' " Id. at 193 (quoting Snyder v. Roberts, 278 P.2d 348, 352 (Wash.1955)); see also Jones v. Cooper, 109 S.E.2d 5, 10 (S.C.1959) ("written agreement between two persons merges all prior talk and negotiations about the subject of the agreement"). The Joyce court then applied the general merger rule to deeds:
 
 
 27
 "Where there is no mistake or fraud a deed executed subsequently to the making of an executory contract for the sale of land is generally regarded as conclusive evidence of a previous modification of the executory contract. A deed executed subsequent to the making of an executory contract for the sale of land supersedes that contract...."
 
 
 28
 Id. (quoting 55 Am.Jur. Vendor and Purchaser § 327). The Wilson court extended to mortgages the merger rule as expressed in Joyce, 315 S.E.2d at 133, and concluded that, by having accepted the final mortgage at closing, the seller could not rely on the terms of a contradictory prior executory contract concerning the mortgage. Id. at 132.
 
 
 29
 The court in Joyce did recognize an exception to the merger rule: When the parties did not intend to surrender rights negotiated for in the previous contract, the previous contract remains binding. 99 S.E.2d at 193. The Joyce court stated immediately before noting this exception that the fact that the deed is executed subsequent to the prior contract "is generally regarded as conclusive evidence" of a modification of the contract. We take this statement to constitute a strong presumption that the parties do not intend that rights provided in an earlier contract should survive a later manifestation of the contract that does not include those rights.
 
 
 30
 In this case, Youmans has not pleaded mistake or fraud in HAC's and Prudential's decision to leave the commitment letter's section 9(e) language out of the final mortgage; he argues instead that the parties intended for the terms of the commitment letter to remain binding in conjunction with the terms of the mortgage. Youmans cannot meet his burden on this issue. Two provisions that directly conflict cannot be read together; only one can remain binding. In this case, the first mortgage executed at closing and the commitment letter directly conflict on whether the right Youmans asserts was negotiated for in section 9(e), that Prudential owes Youmans notice of HAC's default, is due. Section 30 of the mortgage clearly gave Prudential the right "without notice or consent" to enter into an agreement waiving or extending HAC's terms under the mortgage, and it is Youmans' reading of section 9(e) that any such "workout agreement" constitutes a default for which notice is required. Surely the mortgage would not have conflicted with the commitment letter on this point if the parties, financially sophisticated and represented by able counsel, had intended the commitment letter's notice requirements to continue. The case thus fits squarely within Wilson, where the provisions at issue conflicted and the court naturally held that the mortgage's provision, as the later expression of the parties' agreement, controlled over the provision of the earlier contract.
 
 
 31
 In support of his intent argument, Youmans points to references in the two escrow agreements to the terms and conditions of the commitment letter. However, these passing references in the escrow agreements, rather than in the mortgage itself, are too slender a reed upon which to rebut the presumption against finding that the parties intended to include the specific section 9(e) language in the closing documents.
 
 
 32
 We note that Youmans is selective as to exactly what provisions of the commitment letter survived closing, since the mortgage also changed other elements of the commitment letter, some of which benefitted Youmans. For example, section 9(e) of the commitment letter also stated that all interest under the second and third notes would accrue and not be due during the first two years, while the second note signed at closing required that interest be due to the extent that the Hotel generated profits and the third note began to accrue interest immediately. The escrow agreements' passing references to the commitment letter would be of no help in determining which specific elements of the letter remain operative. Because Youmans gives us no reason to favor the notice language over other commitment letter language, the escrow agreements do not help him surmount the Joyce presumption. In addition, the references to the commitment letter were in the recitals section of the escrow agreements, and "[g]enerally, [such recitals] do not have the force of contractual stipulations." 17A Am.Jur.2d Contracts § 392 (1991).
 
 
 33
 Therefore, we hold that the closing documents did not evidence an intention by the parties to retain the section 9(e) notice language. As a result, we hold that the final first mortgage between HAC and Prudential supersedes the commitment letter and controls Prudential's obligations. Because judgment must be entered in Prudential's favor on the contract claim as a matter of law, we hold that the district court erred in denying Prudential's motion for JNOV.
 
 B.
 
 34
 In South Carolina, a cause of action for negligence requires (1) the existence of a duty on the part of the defendant to protect the plaintiff; (2) the failure of the defendant to discharge the duty; and (3) injury to the plaintiff resulting from the failure to perform. South Carolina State Ports Auth. v. Booz-Allen & Hamilton, Inc., 346 S.E.2d 324, 325 (S.C.1986). The question of whether a duty exists is one of law for the court. Shipes v. Piggly Wiggly St. Andrews, Inc., 238 S.E.2d 167, 168 (S.C.1977).
 
 
 35
 It is difficult to pin down exactly what duty Youmans asserts that Prudential owed to him. It is clear that there is no general common law duty for superior mortgagees to refrain from extending time of payment for their mortgagors for the benefit of subordinate mortgagees. See, e.g., Avondale Shipyards, Inc. v. Tank Barge, ETS 2303, 754 F.2d 1300, 1308 (5th Cir.1985) ("when one acquires a lien on property already encumbered by a mortgage, he does so subject to the possibility ... that the lien of the mortgage may be extended beyond the original maturity date or that the terms of the indebtedness may otherwise change") (citing Guleserian v. Fields, 218 N.E.2d 397, 401-02 (Mass.1966), which cites cases for this "universal rule"). Similarly, there is no generalized duty that superior lienholders owe to subordinate lienholders to notify them about defaults in the superior liens or to oversee workout agreements for their benefit, and Youmans presents us with no apposite authority to the contrary.
 
 
 36
 Youmans' strongest, and only remaining, argument is that Prudential owed him a duty arising out of contract, i.e., the commitment letter, to notify him in a timely fashion of HAC's default. Under this theory, Prudential was negligent in its performance of its commitment letter obligation, which also by implication included reasonable oversight of the workout agreement, and the duty was owed to Youmans as third party beneficiary. See Workman v. National Supaflu Sys., Inc., 676 F.Supp. 690, 693 (D.S.C.1987) ("The law is clear that if a person enters upon the performance of a contract, negligent performance, i.e. performing the duties in an improper manner, can result in negligence liability."); Barker v. Sauls, 345 S.E.2d 244, 244 (S.C.1986) ("A tort-feasor may be subjected to tort liability for injury to a third party arising out of the tort-feasor's contractual relationship with another, despite the absence of privity between the tort-feasor and the third party."). But see Meddin v. Southern Ry-Carolina Div., 62 S.E.2d 109, 112 (S.C.1950) ("if the cause of action is predicated on the alleged breach, or even negligent breach, of a contract between the parties, an action in tort will not lie"). This argument fails, however, because, as we have held, Prudential did not breach a contractual agreement of which Youmans was a beneficiary.
 
 
 37
 Because Youmans has not identified a duty owed to him by Prudential that Prudential arguably breached, we must hold that the district court erred in refusing to enter JNOV in favor of Prudential on Youmans' negligence claim. Accordingly, we must also reverse the punitive damages awarded pursuant to the jury's finding of negligence.
 
 III.
 
 38
 Youmans cross-appeals the district court's decision, made at the close of evidence, to direct a verdict in favor of Prudential on Youmans' conspiracy claim. Our standard of review for JNOV is identical to our standard for a directed verdict.
 
 
 39
 In South Carolina, a civil conspiracy consists of (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) which causes the plaintiff special damages. Yaeger v. Murphy, 354 S.E.2d 393, 394 (S.C.App.1987). "[E]vidence, direct or circumstantial, must be produced from which a [jury] may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." Island Car Wash, Inc. v. Norris, 358 S.E.2d 150, 153 (S.C.App.1987) (describing elements of civil conspiracy).
 
 
 40
 Youmans contends that there was sufficient evidence in the record that HAC and Prudential conspired against him to create a jury question on the issue. We disagree. None of the evidence that Youmans presents rises above the level of an arguable conscious indifference by Prudential to Youmans. Youmans cannot demonstrate, as required, that Prudential had the purpose of injuring him. We find the fact that there were certain business and social contacts between officers at Prudential and HAC's general partners unremarkable, and not sufficiently probative of a conspiracy in the absence of specific evidence demonstrating a purpose to injure. Furthermore, that Prudential may have misrepresented its workout agreement to certain auditors does not tend to show a purpose to injure Youmans where there is no showing that Youmans ever relied on the misrepresentations, knew about them, or that they were related to him in any way. In addition, the fact that Prudential wrote HAC to order it not to continue paying the subordinate mortgages, which HAC was paying to conceal its default from Youmans, also supports the view that there was no conspiracy between Prudential and HAC to injure Youmans.
 
 
 41
 Therefore, we affirm the district court's directed verdict in favor of Prudential on Youmans' conspiracy charge.
 
 IV.
 
 42
 For the aforementioned reasons, we hold that the district court erred in denying Prudential's motions for JNOV on Youmans' breach of contract and negligence claims, and we affirm the court's decision to enter a directed verdict in favor of Prudential on Youmans' conspiracy claim.
 
 
 43
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
 
 
 44
 K.K. HALL and MURNAGHAN, Circuit Judges, joined.
 
 
 
 [1]
 The jury also returned an award of actual and punitive damages against HAC, Hecht and Stoler for breach of contract, breach of contract accompanied by a fraudulent act, and fraud, although these co-defendants claimed to be insolvent
 
 
 [2]
 Subsequent to oral argument, Youmans has made a motion for this court to certify the issues raised by this case to the South Carolina Supreme Court for disposition in that forum. Because we find resolution of the issues clear under existing South Carolina case law, we reject this motion
 
 
 [3]
 The partnership at this time was called Hecht and Stoler, Inc.; for convenience, we will refer to the Hecht and Stoler partnership throughout as HAC, the actual Hotel purchaser
 
 
 [4]
 HAC was ultimately unsuccessful in raising additional funds, and, contrary to the agreement, HAC paid itself management fees and repaid the loans from its general partners