0829

William C. ADAMS, Appellant v. DAILY TELEGRAPH PRINTING CO., d/b/a WBTW TV 13; Eastern Carolinas Broadcasting Co., Inc., d/b/a/ WPDE TV 15; Bobby L. Hicks and Gwen Cooper Hicks, Respondents.

(356 S. E. (2d) 118)

Court of Appeals

---

[1] This would be a novel issue in this state. Other jurisdictions are split on the issue. Annot. 81 A. L. R. (3d) 1006 § 11.

*T. Kenneth Summerford* and *Karl A. Folkens*, Florence, *for appellant.*

*D. M. McEachin, Jr.*, Florence, *for Hicks.*

*Reginald C. Brown, Jr.* and *Mary Layton Wells*, Florence, *for Daily Telegraph.*

*John L. Weaver*, Florence, *for Eastern Carolinas.*

Submitted Sept. 24, 1986.

Decided Dec. 8, 1986.

GARDNER, Judge:

William C. Adams (Adams) instituted a defamation action against two individuals and Daily Telegraph Printing Co., d/b/a WBTW TV 13 (TV 13) and Estern Carolinas Broadcasting Co., Inc., d/b/a WPDE TV 15 (TV 15). Summary judgment was by separate orders awarded TV 13 and TV 15. We reverse.

## FACTS

Kent Hicks and Keith Adams, teenage stepbrothers, Kent being the son of respondent Bobby Hicks and Keith the son of respondent Gwen Cooper Hicks, born during her marriage to appellant Adams, were murdered on or about May 6, 1980. The murders were unsolved more than a year later on September 9, 1981; on or about that day TV 13 and TV 15 broadcasted a version of an affair described as a "news conference." Adams contends that the broadcasts implied that Adams had murdered the two teenagers or by refusing to cooperate with the authorities in the investigation of the murders was guilty of a misprision of a felony.

The trial judge had before him on motion for summary judgment an affidavit of Adams which, in effect, says that on September 9, 1981, he heard the following broadcast by TV 13:

> JIM GRIFFIN: Two Florence youths, Kent Hicks and Keith Adams were found shot to death on May 6, 1980. Since this time Law Enforcement officials have conducted an on-going investigation into that case. The families of the victims have offered a reward of more than $30,000 for information leading to the conviction of the assailant or assailants. Today the Hicks Family members called a news conference, Carpenter King Reporter.
>
> CARPENTER KING: According to Mr. and Mrs. Bobby Hicks, each a parent of each of the murdered boys, the times since their deaths on May 6, 1980, have been almost unbearable.
>
> GWEN HICKS: Since the day when I walked up those stairs and called them boys that morning and they weren't in those beds, it has been a living nightmare. It really has and it has never ended. It just kept on and on.
>
> CARPENTER KING: The worst of the ordeal, they say, is not knowing what happened to their sons and in spite of a reward offered by the family, there has been no break-through in this case to this date. Mr. Hicks called a news conference this morning at 10:00 a.m. to announce that he and his wife and Harriett and Charlie Hanna, the Mother and Stepfather of Kent Hicks, have volunteered to undergo truth testing or any other inter-

rogation that the Sheriff's Department considers necessary about their part in the case; however, according to Hicks not all the involved parties are willing to undergo the investigation.

BOBBY HICKS: However, we would like to announce that Mr. Adams employed an attorney approximately a year ago and both he and his Attorney, Mr. Kenneth Summerford, have refused to cooperate. The public is free to draw their own conclusion. I don't believe when our forefathers placed the Fifth Amendment in our Constitution that they intended it as a technicality to hide behind in a matter as serious as this, when your own child has been murdered. I would like to stress that I am not asking anybody to do anything I am not willing to do myself.

CARPENTER KING: We ask Florence County Sheriff Billy Barnes to comment on Mr. Hicks [sic] statement.

SHERIFF BILLY BARNES: Of course, until we actually solve or complete this case everybody is still under suspicion.

TV 15, in support of its motion for summary judgment, filed an affidavit by Jerry Condra, General Manager of TV 15, in which he says he is personally aware of the facts and allegations surrounding this litigation and that their publication was limited to the following:

JAN PATE: More than sixteen months have passed since the murders of Florence County Teenagers Kent Hicks and Keith Adams.

Police have found no motive for the killings, and have made no arrests in connection with the case.

Jeannie Griffin is here to fill us in on the latest development in the case.

JEANNIE GRIFFIN: Bobby and Gwen Hicks have a nice home in the Huntington area.... They have four daughters, one of whom lives with them ... But until May 6th of last year, the couple spent much of their time with their two sons.... Kent Hicks and Keith Adams ... on that date, the boys were found dead.... the victims of a brutal murder.... as of yet unsolved. The police and sheriff departments have looked into the

case. . . . so far no suspects and any leads into the case are a well kept secret . . . But tension still exists, as does grief, in the families of these two boys. . . . Today, Bobby Hicks and his Wife told the news media they want no stone left unturned . . . and they have offered to be questioned by law enforcement authorities through hypnosis or truth serum to clear themselves and prove their innocence. . . .

BOBBY HICKS: The public is free to draw their own conclusions. I don't believe, when our forefathers placed the Fifth Amendment in our Constitution, that they intended it as a technicality to hide behind in a matter as serious as this, when your own child has been murdered. I would like to stress that I am not asking anybody to do anything I'm not willing to do myself.

JEANNIE GRIFFIN: (Studio) I might also mention that the families of these boys offered a reward for information leading to arrests in the case. . . . That amount, Al, of Thirty Thousand Dollars, is still up for grabs. . . . and I'm sure the family and the authorities would welcome any clues to help solve these murders. . . .

TV 15 also filed an affidavit of its employee, Janet Morrow Pate, to the effect that the name of William C. Adams was not mentioned on the broadcast.

Opposing these affidavits, Adams filed, *inter alia,* affidavit of T. Kenneth Summerford, his attorney, to the effect that on September 20, 1981, Summerford wrote a letter to Mr. Jerry Condra, Manager of TV 15, and that Condra replied to this letter stating that in addition to the script above set forth, the following statement by Mr. Hicks was broadcasted.

We requested that Sheriff Barnes contact Mr. William C. (Billy) Adams, father of Keith Adams, and ask him if he wished to join us.

However, we would like to announce that Mr. Adams employed an attorney approximately a year ago and both he and his attorney, Mr. Kenneth Summerford, have refused to cooperate.

The public is free to draw their own conclusions.

I don't believe, when our forefathers placed the Fifth

Amendment in our Constitution, that they intended it as a technicality to hide behind in a matter as serious as this, when your own child has been murdered. I would like to stress that I am not asking anybody to do anything I'm not willing to do myself.

The appealed order granting summary judgment to TV 13 disregarded the alleged innuendo and found that the facts stated in the TV 13 broadcast were true and held that truth was a complete defense. As a further ground for granting summary judgment in favor of TV 13, the order held that TV 13 ws protected by the First Amendment to the United States Constitution under the Hot News Doctrine as announced in the case of *Curtis Publishing Co. v. Butts,* 388 U. S. 130, 87 S. Ct. 1975, 18 L. Ed. (2d) 1094 (1967); and that in view of that doctrine, there was noting to lead the court to believe that the reporter and TV 13 departed from any reasonable standard of investigation and nothing to show that the broadcast was made on information furnished by an unreliable source without further verification.

The order granting summary judgment in favor of TV 15 also disregarded the alleged innuendo and found that the facts stated in the TV 15 broadcast were true and that the truth was a complete defense. This order also found that the name of Adams was not mentioned in the broadcast and that TV 15 has in no way acted negligently or with malice or recklessness in making the broadcast.

The trial court disregarded the affidavit of T. Kenneth Summerford in making its decision; the order settling the case for appeal held that it was vague and biased. We later address this issue.

## ISSUES AND DISCUSSION

The case hinges upon two basic questions. First, do the broadcasts have a defamatory effect as to Adams, i.e., can an inference be fairly drawn from them that Adams either murdered the teenagers or is withholding information about the commission of the crime? Second, are the defendants protected by a qualified privilege described by the trial judge as hot news?

## I.

The trial judge held that the facts as broadcast, without ascribing any innuendo to them, were true. In so holding the trial judge missed the point of the case made by the pleadings. Adams alleged in paragraph three of his complaint that the broadcasts by TV 15 and TV 13 were made "intentionally and willfully with a wanton, reckless disregard for the truth of the statements or the innuendo arising therefrom." Innuendo, thus, is the heart of the case and this appeal.

The general rule applicable to the issue before us is set forth in 53 C. J. S. *Libel and Slander* Section 223(a) (1983) as follows:

> The defamatory character of the words complained of is for the jury if the language is susceptible of two meanings, one defamatory and the other innocent; but if the language is unambiguous the question is for the court. The court determines whether the language is capable of the meaning ascribed to it, and the jury determines whether the language had the meaning ascribed to it.

The south Carolina rule goes further and holds that a demurrer to a complaint (and inferentially a motion for summary judgment) "will only be sustained where the court can affirmatively say that the publication is incapable of any reasonable construction which will render the words defamatory." Our courts also hold that any words which raise a *strong suspicion* of the plaintiff's guilt in the minds of the hearers are sufficient upon which to base a cause of action for slander or libel. And even stronger, our courts hold that if the words *are capable* of the offensive meaning attributed to them, then an action for libel or slander lies. *Flowers v. Price*, 192 S. C. 373, 6 S. E. (2d) 750 (1940).

We first hold that in this case the language broadcasted, to say the least, is susceptible of the inference that Adams was either guilty of the murders of the teenagers or was withholding information relative to the commission of the crimes. Indeed, the broadcasts would have had no newsworthiness but for the implication that (1) because Adams refused to be examined while under a truth serum, (2) because he was not cooperating with the police authorities, (3)

because he was hiding behind the Fifth Amendment and (4) because he had employed an attorney, he, Adams, was guilty of either the murders or withholding information about them. That the Hickses intended that the public draw a conclusion from the broadcast other than the literal meaning was made manifest when they said "the public is free to draw their own conclusion." We therefore hold that whether the broadcasts were slanderous and/or libelous is a jury question.

## II.

We next address whether the broadcasts referred to appellant Adams and identified him as the object of the alleged slander and/or libel.

The appealed order, for palpably untenable reasons, ruled that the Summerford affidavits were inadmissible. Adams appeals the order settling the case for appeal and included the Summerford affidavits in the addendum of the transcript of record. We reverse the order settling the case for appeal. The appealed order held that TV 15's broadcast could not be related to Adams; the Summerford affidavit with attached letter from Mr. Morgan of TV 15 explicitly naming William C. Adams creates an issue of fact as to whether Adams' name was used in the TV 15 broadcast. We therefore reverse the appealed orders holding that Adams was not identified; this is a jury question and we so hold. Similarly, we hold that whether the TV 13 broadcast sufficiently identified appellant Adams is a jury question. In the TV 13 broadcast the murder of Keith Adams and his stepbrother Kent Hicks was referred to; then it was made plain that Mr. Adams had hired a lawyer, et al.; the implication that the Adams mentioned in the broadcast as hiring a lawyer, refusing to take the truth serum, etc., was William C. Adams, the ex-husband of Mrs. Hicks. It is sufficiently clear to create a jury question as to whether the TV 13 broadcast was interpreted by one or more of the viewers as a reference to appellant Adams.

And we hold it unnecessary in this case to review the law of qualified privilege. The reader is referred to Prosser and Keaton *On the Law of Torts* (5th ed. 1984), Ch. 19, Section 115; this interesting treatise fully reviews the law of qualified privilege.

We further hold that the broadcasts were not protected by the First Amendment to the United States Constitution. Here we are not dealing with an office holder or public person as was the case in *Curtis Publishing Co. v. Butts, supra,* relied upon by the appealed order. Adams is neither a public person nor an office holder; in such a case the states are free to establish their own laws about libel and slander. This case is governed by *Stevens v. Sun Publishing Co.,* 270 S. C. 65, 240 S. E. (2d) 812 (1978).

Hot news is that news which will lose its newsworthiness if not promptly published. In the case before us, we hold the trial judge erred in considering as hot news the publications by the two TV stations more than a year after the murders; it was not and we so hold. TV 13 and TV 15 enjoyed no privilege in the publication nor were the publications within the purview of publications protected by the First Amendment to the U. S. Constitution, and we so hold.

For the reasons stated, the judgment below is reversed.

Reversed.

SHAW and LITTLEJOHN, JJ., concur.

## ORDER

Petitions for Rehearing by both TV 13 and TV 15 are before us. We hold that no principle of law was overlooked in the opinion of this court filed December 8, 1986.

On rehearing, however, the opinion is modified to reflect that the Summerford affidavit had attached a letter from Dave Morgan, news director for TV 15, rather than Jerry Condra, manager of TV 15 to whom Summerford had written; Morgan, rather than Condra, answered Summerford's letter.

We find no merit to the petitioners' position that the letter is inadmissible; it is evidence of an admission on the part of TV 15 and therefore admissible in evidence when properly offered. The manner by which it is offered is a concern of the trial judge, not this court.

It is so ordered.