0182

Mary Jo WARDLAW, Respondent, v. Robert Newton PECK, Appellant.

(318 S. E. (2d) 270)

Court of Appeals

*Eugene C. Griffith, Griffith, Mays, Foster & Kitrell,* Newberry, *for appellant.*

*J. Kendall Few,* Greenville, *for respondent.*

Heard Jan. 24, 1984.

Decided May 25, 1984.

BELL, Judge:

This is an action for slander brought by Mary Jo Wardlaw against Robert Newton Peck. The jury returned a verdict of $4,000 actual and $20,000 punitive damages for Wardlaw. Peck appeals. We affirm.

The facts are substantially undisputed. Peck, an author of children's books who teaches at Rollins College in Florida, was invited to speak to a convocation at Erskine College in Due West, South Carolina. Wardlaw, a student at Erskine, was to meet Peck at the Greenville-Spartanburg airport the day before the convocation and drive him to Due West, about an hour away. Due to confusion on her part, Wardlaw failed to meet Peck as planned. Arriving and finding no one at the airport, Peck telephoned the college chaplain and informed him, "You don't keep a person of my stature waiting." Peck then hired a cab at the college's expense and arrived in Due West a little over an hour after the plane landed.

When Peck arrived at the college he was still very angry about not being met at the airport. The chaplain apologized for Wardlaw's failure to meet the plane. Peck replied that he would "deal with Mary Jo the next day in convocation."

Attendance at the convocation was mandatory for Erskine students. Wardlaw and approximately six hundred students and faculty were present the next day. Wardlaw was pointed out to Peck, but otherwise they had no communication prior to his speech.

During his speech, Peck proceeded at various points to refer to Wardlaw. He stated that he generally liked everyone, but he hated one Erskine College student named Mary Jo Wardlaw because she was late to pick him up at the airport. He repeatedly referred to Wardlaw as "Mary Jo Warthog" or "Warthog". He likened her to a fictitious character in one of his books called "Janice," who he said was the "bully of his childhood." He described "Janice" as "built like a garbage truck" with "fists like cannonballs" and said she walked hunched over with her fists dangling before her so her left arm swung over her left leg and her right arm swung over her right leg. He said Mary Jo Wardlaw was late to the airport because she walked like "Janice." He then mimicked Wardlaw's supposed walk by walking across the stage in front of the convocation audience in an ape-like position.

Mixed in with these comments, Peck made an additional statement which is the basis of this action. One of Wardlaw's witnesses described the statement in these words:

> Aside from the fact that there were a number of remarks made about Mary Jo, using Mary Jo War[t]hog or Warthog in the description, the thing that's clearest, most clear to me, was ... at some point in the convocation someone made some disruption and Roger Findley's name came out ... from a fellow student, and then later on in the convocation ... he [Peck] then made a statement that he had a recurring nightmare that Mary Jo and Roger Findley [a male Erskine student] were breeding under his sink.

Another witness recalled the statement as:

> I have a recurring dream.****I see the Warthog in this dream breeding with Roger Findley under my typewriter.

Peck admitted he made the statement, but testified he had never met Wardlaw when he made it and he intended it in jest. He said his purpose was not to humiliate, but merely to poke

fun. When asked about the use of the word "breeding," he said, "I was referring to bugs." At trial Peck stipulated that Wardlaw is a chaste person who would not have sex with somebody under a sink.

Wardlaw's complaint stated two causes of action: one for slander and the other for outrageous conduct causing severe emotional distress. As the case was tried prior to the decision of the Supreme Court in *Ford v. Hutson*, 276 S. C. 157, 276 S. E. (2d) 776 (1981) (recognizing the tort of outrage in South Carolina), the trial judge struck the second cause of action and submitted the case to the jury on the slander claim alone. He instructed the jury that, for the purposes of this case, a false oral statement which was intended and understood to impute unchastity or serious sexual misconduct to a woman was actionable without proof of special harm or damage to her reputation. This was the only theory of liability presented to the jury.[1]

Peck makes two arguments on appeal; (1) the offending statement was not defamatory, because no one could interpret it as a literal charge of unchastity against Wardlaw; and (2) if the statement was an imputation of unchastity, he is not liable for it, because the South Carolina statute making imputation of unchastity to a female actionable *per se* creates an unconstitutional, gender based classification. We address each argument in turn.

## I.

Peck contends his statement could not be understood by the convocation audience as imputing unchastity to Wardlaw because of the circumstances in which it was uttered. He maintains the audience knew he had never met Wardlaw. They also knew he did not know Roger Findley, but merely heard his name from someone calling out in the crowd. Peck urges us to interpret his statement in light of these surrounding circumstances allegedly known to his hearers. He points out that none of Wardlaw's witnesses at trial

---

[1] Wardlaw did not contend the words were actionable *per se* because Peck's reference to "breeding" imputed the criminal offense of fornication. *See,* Section 16-15-60, Code of Laws of South Carolina, 1976. Since the jury did not consider liability on this theory, we do not decide whether the verdict could be sustained on that ground.

actually thought she was unchaste as a result of hearing the statement. He does not dispute, however, that the word "breeding" could carry a suggestion of the sex act.

Peck's argument is an interesting attempt to revive the ancient doctrine that words alleged to be defamatory must be construed *in mitiori sensu.* Under the *mitior sensus* rule, if words could be construed in either a defamatory or a non-defamatory sense, the court was required, as a matter of law, to give them the nondefamatory meaning. *See, Stanhope v. Blyth* (1585) 4 Rep. 15a, 76 Eng. Rep. 891. The rule produced many charming examples of judicial ingenuity. For example, words suggesting the plaintiff was a "forger" were construed as imputing the occupation of an honest blacksmith rather than a felon.[2] Perhaps the most famous exercise of judicial imagination was *Holt v. Astrigg* (1607) Cro. Jac. 184, 76 Eng. Rep. 161, in which an action was brought for the words, "Sir Thomas Holt struck his cook on the head with a cleaver, and cleaved his head; the one part lay on the one shoulder and another part on the other." The court adjudged for the defendant, refusing to interpret the words as imputing a felony:

> . . . for slander ought to be direct, against which there may not be any intendment: but here, notwithstanding such wounding, the party may yet be living; and it is then but trespass.

The English courts had abandoned the *mitior sensus* rule by the early eighteenth century, replacing it with the modern rule that the words are to be taken in their natural sense as they would be understood by the hearer. *See, Harrison v. Thornborough* (1714) 10 Mod. 196, 88 Eng. Rep. 691.[3] After the passage of Fox's Libel Act,[4] it became firmly established that

---

[2] C. Lovell, *The "Reception" of Defamation By the Common Law,* 15 Vand. L. Rev. 1051, 1065 n. 43 (1962).

[3] Lord Chief Justice Holt was influential in bringing about the change. *See Somers v. House* (1963) Holt K. B. 39, 90 Eng. Rep. 919; "And tho' in the old books the rule was, to take the words in mitiori sensu; Yet by Holt C. J. they would give no favour to words, and should give satisfaction to them whose reputation is hurt; and would take words in a common sense according to the vulgar intendment of the bystanders." *See also Baker v. Pierce* (1704) 6 Mod. 24, 87 Eng. Rep. 787 (per Holt, C. J.); *Peake v. Oldham* (1775) 1 Cowp. 275, 98 Eng. Rep. 1083 (per Lord Mansfield).

[4] 32 Geo. 3. c. 60 (1792).

whether the words had defamatory meaning was to be decided by the jury, not the court.[5] South Carolina received the modern rule into its common law in the early nineteenth century. *See Jones v. Rivers,* 5 S. C. L. (3 Brev.) 95 (1812).

In the case of *Davis v. Johnston,* 18 S. C. L. (2 Bailey) 579 (1832), O'Neall, J., gave the definitive statement of the law:

> The rule in verbal slander, as to the construction of words, is, that they are to be understood in their ordinary and popular meaning. If words are susceptible of two meanings, one imputing a crime, and the other innocent, the latter is not to be adopted, and the other rejected, as a matter of course. In such a case, it must be left to the jury to decide in what sense the defendant used them. Their conclusion must be formed from the whole of the circumstances attending the publication, including the sense in which the witnesses understood the words.

This clear rejection of the *mitior sensus* rule remains the law today. *See Tucker v. Pure Oil Co. of the Carolinas,* 191 S. C. 60, 3 S. E. (2d) 547 (1939); *Renew v. Serby,* 237 S. C. 116, 115 S. E. (2d) 664 (1960); *Davis v. Niederhof,* 246 S. C. 192, 143 S. E. (2d) 367 (1965).

In this case, Peck concedes his words could be understood as describing sexual intercourse between Wardlaw and a male student. His primary defense is that his hearers would not have believed the statement was literally true. How the words were to be understood in the circumstances in which they were uttered was a question for the jury, not the court, to decide. In the jury's view, the words had defamatory meaning. We find no basis in law to set aside their verdict on this point.[6]

## II.

In the alternative, Peck argues that even if the words were defamatory, they are not actionable without proof of special damage. He acknowledges that Section 15-75-10, Code of Laws of South Carolina, 1976, makes the false imputation of un-

---

[5] The same development had been foreshadowed in this country by the trial of John Peter Zenger for seditious libel in 1735. *See* J. Alexander, *A Brief Narrative of the Case and Trial of John Peter Zenger* 22-23, 30-31 (1963). Zenger's lawyer, Andrew Hamilton of Philadelphia, successfully argued to the jury that they, not the court, had the right to determine whether the words charged were libellous.

chastity to a female actionable without proof of special damage. However, he asserts the statute embodies an unconstitutional, gender based classification, since it relieves only women of the burden of proving special damage. For this reason, he asks us not to apply the statute, but rather to decide the case on common law principles. In his view, the common law requires proof of special damage to make an imputation of unchastity actionable slander.

### A.

Wardlaw's response is to claim she has proved special damage. Therefore, she argues, the constitutionality of the statute need not be addressed. She relies on substantial evidence at trial that Peck's speech caused her mental and emotional suffering. Her witnesses testified she was embarrassed and humiliated by Peck's remarks. She cried in her room, was upset emotionally and mentally, and missed at least one meal and one day of class as a result of Peck's ridicule. Wardlaw testified she was unable to face people in public after the incident. To some extent the name "Warthog" stayed with her on campus, causing her additional humiliation.

We do not view Wardlaw's hurt feelings, however genuine, as special damage making Peck's words actionable *per quod*. The gist of defamation lies not in the hurt to the defamed person's feelings, but in the injury caused his reputation, i.e., the feelings toward him entertained by other persons. *Urban v. Hartford Gas Co.*, 139 Conn. 301, 93 A. (2d) 292 (1952); Restatement (Second) of Torts § 559 (1977). Where special damage is necessary to maintain an action, that special damage must consist of some provable material loss to the plaintiff as a result of the injury to his reputation. *Mell v.*

---

[6] Peck relies on *Renew v. Serby, supra*, for the proposition that the court should not permit the case to go to the jury unless the defendant's remarks may reasonably be construed as charging the plaintiff with unchastity. *Renew v. Serby* is factually distinguishable from this case. In *Renew v. Serby* the plaintiff's supervisor made remarks to the effect that she should refuse to have sexual relations with her husband that night because she would have to work the next day. The court found that, at worst, the words could be interpreted as suggesting the plaintiff forego marital intercourse in favor of an illicit relationship with the defendant. They did not suggest she had actually engaged in any unchaste conduct. In contrast, Peck's words were susceptible of the interpretation that Wardlaw had been "breeding" with a male student.

*Edge,* 68 Ga. App. 314, 22 S. E. (2d) 738 (1942), cited with approval in *Brown v. National Home Insurance Co.,* 239 S. C. 488, 123 S. E. (2d) 850 (1962). Courts have long refused to treat the plaintiff's own emotional distress as special damage in defamation cases.

In the leading case of *Terwilliger v. Wands,* 17 N. Y. 54 (1858), Wands told several people Terwilliger, a farmer, had beaten a regular path to Mrs. Fuller's house for the purpose of "having connection with her;" that Mrs. Fuller was a "bad woman;" and that Terwilliger "would do all he could to keep the husband of Mrs. Fuller in the penitentiary so that he could have free access there." When Terwilliger learned of these aspersions on his character, he became distressed, melancholy, pale, and sick. He left his fields and was unable to work by reason of his sickness and bodily prostration.

The court held these facts did not prove special damage. After reviewing the authorities, the court concluded the special damage necessary to support a claim for words not actionable *per se* must result from a proven injury to the plaintiff's reputation which affects the conduct of others toward him. His own distress and illness, though occasioned by the slander, are not such special damage as will support the action. The modern authorities adhere to the same rule. *See, e.g. Tallent v. Blake,* 57 N. C. App. 249, 291 S. E. (2d) 336 (1982) (plaintiff's emotional distress and humiliation are not enough to support a claim actionable *per quod);* Annot., 90 A.L.R. 1175, 1200-1203 (1934). Although we find no South Carolina decision directly on point, the opinion of our Supreme Court in *Brown v. National Home Insurance Co.,* 239 S. C. 488, 123 S. E. (2d) 850 (1962), also suggests that embarrassment and humiliation alone do not constitute special damage where the alleged defamatory words are not actionable in themselves.

We perceive on sound reason for departing from the generally accepted rule in this case. We are especially reluctant to enlarge the concept of special damage in defamation to include emotional distress, since intentionally inflicted emotional distress now may give rise to an action for the separate tort of outrage in this jurisdiction. *See Ford v. Huston, supra.* We therefore hold that Wardlaw's emotional distress and humiliation were not special damage making Peck's statement actionable.

## B.

Since Wardlaw has failed to prove special damage, we unavoidably face Peck's contention that the statute making imputation of unchastity to a woman actionable without proof of special damage is unconstitutional. Briefly stated, Peck's argument is that the statute creates an impermissible gender classification because it gives only women a cause of action. In his view, we should refuse to apply the statute and instead follow two early South Carolina cases, *Boyd v. Brent*, 5 S. C. L. (3 Brev.) 241 (1812), and *W____ v. L____*, 11 S. C. L. (2 Mott & McC.) 204 (1819), which held that words imputing unchastity to a woman are not actionable without proof of special damage. For the reasons which follow, we find no constitutional infirmity in the statute.

The statute cannot properly be understood without reference to the origin of the common law rule that special damage must be proved in actions for defamation.

Until the late fifteenth century, jurisdiction over defamation rested almost exclusively with the ecclesiastical and local courts in England. The common law granted no remedy for injury caused by words. With the expansion of crown jurisdiction under the Tudor monarchy, the picture changed. During the reign of Henry VIII, the common law courts entered the field by recognizing an action on the case for words.[7] The gist

---

[7] Y. B. Hil. 26 Hen. 8, f. 9, pl. 1 (1535), cited in Fifoot, *History and Sources of the Common Law* 129 (1949), in which the plaintiff successfully maintained an action on the case for words accusing him of theft. Prior to recognizing an action for defamation themselves, the common law judges had already begun to interfere with ecclesiastical jurisdiction over defamation where the words imputed conduct to the plaintiff which would be actionable at common law. A comic example is the case of the Abbot of St. Albans (22 Edw. 4) reported by Coke at 4 Rep. 20a, 76 Eng. Rep. 909. A servant of the abbot had, at the direction of his master, prevailed on a married woman to come to the abbot's chamber. When the woman and the abbot were together, the servant "(who knew his master's will)" withdrew, leaving them alone. The abbot began to find fault with the meanness of the woman's dress and suggested "(knowing in what women repose delight)" that if she would submit to his will, she should go as well dressed as any woman in the parish. When she refused the proposal, he, after assaulting her and making an unsuccessful attempt to lie with her by force, locked her in his chamber. The husband being informed of the abuse to his wife, spoke publicly of the abbot's behavior; whereupon, the abbot sued the husband for defamation in the spiritual court for publishing that the abbot had solicited his wife's chastity and, when she refused, assaulted her and kept her in his chamber against her will. The husband was granted a writ of prohibition against the ecclesiastical proceeding because the matter charged would be actionable law: "for if such defamation touches or concerns any thing determinable at the common law, the Ecclesiastical Judge shall not have cognizance of it." Once the ecclesiastical courts were deprived of jurisdiction in such cases, the pressure for recognition of a common law remedy for defamation increased.

of the action on the case was damage. Thus, the theory of the common law action for defamation was that the words had caused damage to the plaintiff, not that they insulted him. Unless damage was pleaded and proved, the action would not lie at common law. In other words, the requirement that damage follow from the defamation was a jurisdictional principle determining whether a case could be brought at common law rather than in the ecclesiastical courts.

Because the ecclesiastical courts had no power to grant money damages,[8] the new common law action enjoyed an immediate popularity. By the end of the Elizabethan period, the common law courts were flooded with suits for defamation. In order to limit the volume of litigation, the judges began to circumscribe the action with restrictive rules. One of these was the *mitior sensus* rule discussed above. Another was the rule that the damage necessary to support the action must be "temporal," i.e., some actual material loss caused by the defamatory words. If no "temporal" loss was shown, then the injury lay merely in the publishing of false statements about the plaintiff, a "spiritual" matter cognizable exclusively in the ecclesiastical courts.

During this period of judicial retrenchment, the English courts settled the rule that words imputing sexual immorality to the plaintiff, without more, would not give rise to an action at common law. Two cases reported by Sir Edward Coke exemplify this restrictive approach. In *Palmer v. Thorpe* (1583) 4 Rep. 20a, 76 Eng. Rep. 909, it was resolved that defamation touching merely spiritual matter, "as for calling him 'heretic, schismatic, adulterer, fornicator, & c.'" was determinable in the ecclesiastical courts, not at common law. Such defamation was considered merely spiritual because adultery and fornication were not common law crimes. Similarly, in *Oxford & ux. v. Cross* (1599) 4 Rep. 18a, 76 Eng. Rep. 902, the King's Bench refused to allow an action for calling the plaintiff's wife a "whore," observing tersely that "to maintain actions for such brabling words is against law."

---

[8] *Palmer v. Thorpe* (1583) 4 Rep. 20a, 76 Eng. Rep. 909. The remedy in the ecclesiastical court was confession and penance for the sin of bearing false witness against the plaintiff. If the defendant did penance, the plaintiff was then rejoined by Christian charity to forgive the wrong.

These judicial doctrines shifted the emphasis in defamation actions. By 1640 the common law drew a reasonably clear distinction between mere abusive or insulting words, for which no action would lie, and words wrongful in themselves, from which damage would be implied without further proof. It became recognized that an imputation of a criminal act, of unfitness for one's office or trade, or of a loathsome disease was injurious in itself. The law, therefore, presumed damage in those cases. In all other cases, damages still had to be specially proved. As a result, the majority of actions for defamation throughout the seventeenth century were for words wrongful in themselves.[9]

Once the law was settled along these lines, further change was resisted. Thus, two hundred years after *Oxford & ux. v. Cross* it was still possible to sue for a false imputation of unchastity in the ecclesiastical courts, but no action would lie at common law. In *Carslake v. Mapledoram* (1788) 2 T. R. 473, 100 Eng. Rep. 255, the plaintiff sued in the Archdeacon's Court of Exeter for the words: "I have kept her common these seven years; she hath given me the bad disorder, and three or four other gentlemen." The defendant moved in the King's Bench for a writ of prohibition on the ground that the words alleged were actionable at common law. The court held the words charged the plaintiff with being a whore. Therefore, they were not actionable at common law and the suit was properly within the jurisdiction of the ecclesiastical court.

It was at this stage of legal development that the South Carolina courts were called upon to decide the rule of liability for false imputation of unchastity to a woman. In the two cases on which Peck now relies, *Boyd v. Brent, supra,* and *W_____ v. L_____, supra,* our courts adopted the English rule.

*Boyd v. Brent* was an action brought for calling the plaintiff's wife a "whore." On the authority of *Oxford & ux. v. Cross, Carslake v. Mapledoram,* and other English precedents, the South Carolina judges held the words were not actionable. However, the opinion suggests the court doubted the justice of the English rule and would have reached a different result if it had regarded the question as an open one.

---

[9] J. Kaye, *Libel and Slander—Two Torts or One?* 91 L. Q. R. 524, 527 (1975).

In $W$_____ $v.$ $L$_____ , an action was brought on the words, "I caught Lucy W _____ in bed with Ephraim L _____ ." Citing *Boyd v. Brent,* a divided court held the words charging a woman with a breach of chastity are not actionable without special damage following. The court was openly critical of the rule, observing that "this is one of those decisions, springing from common law doctrines often complained of, but now requiring legislative aid to remedy after inveterate practice."

The General Assembly responded in 1824 by making imputation of unchastity to a woman actionable without proof of special damage. *See* c. 4, sec. 3, Acts and Resolutions of the General Assembly of the State of South Carolina Passed in December, 1824, at 23 (1825); *Freeman v. Price,* 18 S. C . L. (2 Bailey) 115 (1831). It is this statute, now codified as Code § 15-75-10, which Peck asserts is unconstitutional.

Peck's argument against the statute rests on the unstated assumption that the modern law affords no action to a male plaintiff for a false imputation of serious sexual misconduct, unless he can prove special damage. Peck, therefore, reads the statute invidiously favoring one sex over another without substantial justification for the discrimination.

Nothing in the statute of 1824 supports this assumption. The statute is classic remedial legislation. It was enacted to remove the rule in *Boyd v. Brent* from our jurisprudence. It applied to women because the rule laid down in the cases applied to women. The statute did not legislate a positive rule that imputation of unchastity to a man is not actionable *per se.* It simply removed a disability imposed by the common law on women. Because the statute does not contain express authority for men to sue without proof of special damages does not mean the right does not exist. *Cf., Bouchette v. International Ladies Garment Worker's Union, AFL-CIO, Local No. 371,* 245 S. C. 586, 141 S. E. (2d) 834 (1965). It is entirely consistent with equal protection for legislature to address that aspect of a problem which calls for the most immediate remedy. *McDonald v. Board of Election Commissioners of Chicago,* 394 U. S. 802, 89 S. Ct. 1404, 22 L. Ed. (2d) 739 (1969).

Since the statute is not unconstitutional in itself, we will not create a constitutional question by drawing a distinction between men and women based on a com-

mon law rule. Peck has cited no South Carolina decision holding that a false imputation of unchastity to a man is not actionable without special damage; and we are aware of none.[10] *Boyd v. Brent* and *W_____ v. L_____* did not address the question, because the charge of unchastity in those cases was against a woman. The rule of those cases should be limited to their facts.

We conceive modern common law liability for a false imputation of unchastity to rest on the principle that the law presumes damage by looking to the inference of hurt to reputation which arises in the minds of reasonable persons from the seriousness of the charge. *Cf., Capps v. Watts,* 271 S. C. 276, 246 S. E. (2d) 606 (1978).[11] There is no reason to distinguish between men and women in the application of this rule. Surely, a man's reputation for decency and honor is no less dear to him than is a woman's to her.

Lord Mansfield once observed, "The reason and spirit of cases make law, not the letter of particular precedents." *Fisher v. Prince* (1762) 3 Burr. 1363, 97 Eng. Rep. 876. The historical reasons for the English rule counsel against its further enlargement by judicial decision in this day and time. The jurisdictional principle behind the rule was obsolete at the time it was adopted in South Carolina. Today there is even less warrant to extend a common law doctrine, clearly repudiated by the Legislature in 1824, in order to strike down the very statute which reformed the old rule.

Peck would have us freeze South Carolina's common law in a sixteenth century English mold so he can escape liability. This approach strikes us as neither sensible nor just. In our opinion, it would be inconsistent with the true spirit of the common law to contrive such a result. We believe precedents should be "stepping stones, and not halting-places." *Birch v. Brown* [1931] A. C. 605, 631.

---

[10] The English courts so held in *Jones v. Jones* [1916] 2 A. C. 481. For American authorities, see Annot., 55 A.L.R. 175 (1928). A number of American jurisdictions have found imputation of unchastity to a man actionable *per se* on the theory that the crimes of adultery or fornication were imputed. *Id.*

[11] "In the present century the strong tendency is for the court to say, without beating about the bush, that a false oral charge of unchastity . . . is such serious defamation that it is slander per se, regardless of whether the particular conduct charged is a crime. This is today the prevailing view and the view taken in the *Restatement.*" L. Eldredge, *The Law of Defamation* pp. 120-121, 621 (1978).

We also reject Peck's suggestion that under contemporary social standards a false imputation of sexual misconduct to a person of either sex is not worthy of legal redress without proof of special damage.[12] However relaxed modern standards of civility may be, if the words would "hurt the plaintiff in the estimation of an important and respectable part of the community," then "liability is not a question of a majority vote." *Peck v. Tribune Company*, 214 U. S. 185, 190, 29 S. Ct. 554, 556, 53 L. Ed. 960, 962 (1909) (Holmes, J.). In our view, juries are better situated than judges to measure injury to a person's good reputation according to the plural standards of the contemporary community. To impose on plaintiffs of either sex an antiquated rule requiring special damage before words imputing sexual misconduct can be actionable would foreclose the jury from making the judgment in virtually every case.

Affirmed.

SHAW and GOOLSBY, JJ., concur.

---

[12] In Peck's words, "The standards of chivalry in years gone by, especially in the antebellum days, were certainly different than those imposed in today's society in an ever changing world."