493 S.E.2d 345

William Gary WHITE, III, and John T. McMillan, Appellants,

v.

Avery B. WILKERSON, Jr., individually and in his official capacity as mayor of the City of Cayce; E.H. Heustess, Jr., individually and in his official capacity as city manager of the City of Cayce; and Columbia Bible College Broadcasting Co., Inc., d/b/a WMHK Radio Station, Respondents.

No. 24711.

Supreme Court of South Carolina.

Heard Feb. 21, 1996.

Decided Nov. 10, 1997.

Rehearing Denied Dec. 5, 1997.

Lex. A. Rogerson, Jr., Lexington, for appellants.

Susan P. McWilliams and J. Michelle Childs, of Nexsen Pruet Jacobs & Pollard, LLP, Columbia, for respondent Avery B. Wilkerson, Jr.

William L. Pope and Roy F. Laney, of Pope & Rogers, Columbia, for respondent Columbia Bible College Broadcasting Co., Inc., d/b/a WMHK Radio Station.

WALLER, Justice:

Appellants sued respondents alleging certain statements broadcast in a radio interview had defamed them. The trial court granted summary judgment for respondents, finding the statements complained of were incapable of having a defama-

tory meaning and the radio station was qualifiedly privileged. Appellants have appealed.

## FACTS

In 1990 Appellants, who are attorneys, represented two former police officers in a lawsuit alleging civil rights violations against the City of Cayce. The officers claimed they were fired for exposing corruption in the police department. This lawsuit was settled in January 1991 for $65,000. *The State* newspaper reported the settlement on January 24, 1991, naming appellants as the officers' attorneys. Beginning Sunday, February 10, 1991, *The State* published a week-long series of articles on the subject of alleged police brutality and official cover-ups of illegal activity involving the City of Cayce police department. In one, appellant White was quoted as saying, "It's like the 'Dukes of Hazzard' over there." The article stated White was an expert on the Cayce police's pattern of abuse, having brought nine of fifteen lawsuits in eight years against the city for police brutality, civil rights violations and false arrests. In that same article, Cayce Public Safety Director Lavern Jumper stated he blamed the number of brutality complaints on White, characterizing him as a "headline hungry lawyer."

In response to these articles, the City of Cayce issued a news release at a press conference held Thursday, February 14, 1991. While appellants were not specifically named in this release, several statements referred to an attorney who had brought a majority of lawsuits against the police department and "who attempts to garner whatever media coverage he can in an attempt to discredit our Police Department."

Subsequent to this press conference, respondent Wilkerson, the mayor of Cayce, appeared with other city officials on a radio show entitled "Vantage Point" aired by respondent Columbia Bible College Broadcasting Co., Inc. d/b/a WMHK Radio Station ("WMHK"). In answering a question posed by the show's host, Wilkerson stated, "the last settlement that was made was a $65,000 settlement back in January. Okay? That settlement itself was total court costs. Okay? That was settled before the case actually got before the jury and that

$65,000 [was] for court costs. What's interesting about that $65,000 is at least $60,000 of that were attorney fees."

On March 6, 1991, Wilkerson appeared live on a WIS–TV news program called "The Carolina Report." When the show's host asked about Cayce's investigation into the facts surrounding the settled lawsuit, Wilkerson's reply was something to the effect that "approximately $60,000 of that money was for legal costs only." Both statements made by Wilkerson were false; the attorneys' fees from the settled lawsuit amounted to $27,500.

Appellants brought a defamation action against respondents for injury to their reputation caused by Wilkerson's statement that $60,000 of the $65,000 settlement was attorneys' fees. The trial judge found this statement had no defamatory meaning and that WMHK had a qualified privilege to air it. He thus granted summary judgment in favor of respondents.

## ISSUES

I. Are the statements capable of having a defamatory meaning?

II. Was WMHK privileged to air the statements?

## DISCUSSION

### I. Defamatory Meaning

In order to succeed on a defamation claim, the plaintiff must show that the challenged statement is both defamatory (tending to impeach the plaintiff's reputation) and actionable (injuring the plaintiff). *Austin v. Torrington Co.*, 810 F.2d 416 (4th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). The trial judge's order focused on this first requirement in that he ruled Wilkerson's statements could not tend to impeach appellants' reputation. We disagree.

It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning. *Pierce v. Northwestern Mut. Life Ins. Co.*, 444 F.Supp. 1098 (D.S.C.1978). A motion for summary judgment should be granted only if the court determines the publication

is incapable of any reasonable construction which will render the words defamatory. *Adams v. Daily Telegraph Printing Co.*, 292 S.C. 273, 356 S.E.2d 118 (Ct.App.1986), *aff'd as modified*, 295 S.C. 218, 367 S.E.2d 702 (1988). It is enough "if the words used to express the charge are such, in the sense in which they would naturally be understood, as to convey to the minds of those to whom they are addressed ... the impression that the plaintiff has [done wrong]. It is only necessary that the words should ... be capable of the offensive meaning attributed to them." *Flowers v. Price*, 192 S.C. 373, 377, 6 S.E.2d 750, 751 (1940) (per curiam). "[A]ll of the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have." *Jones v. Garner*, 250 S.C. 479, 485, 158 S.E.2d 909, 912 (1968) (citation omitted).

Appellants alleged Wilkerson's statements imputed unfitness in their profession. When viewing the evidence and inferences in the light most favorable to the non-moving party, we agree that the statements could reasonably be construed in such a manner. In making this determination, it is essential to keep in mind the profession involved. *See Nash v. Sharper*, 229 S.C. 451, 457, 93 S.E.2d 457, 460 (1956) ("Words, not [defamatory] in the case of a common person, may become so, when spoken of another, in relation to the office he fills or the trade or profession which he carries on.") (internal quotations omitted). When attorneys bring civil lawsuits on behalf of injured clients, it is well understood that the remedy sought is monetary damages. To state that an attorney took all (or nearly all—ninety-two per cent) of a settlement award, and thus the clients, on whose behalf the lawsuit was brought, got nothing, could impute a derogation from the ethical responsibilities of that attorney. Such a comment could tend to injure an attorney in his profession because it implies that his interests are more important than those of his client. Moreover, it implies that the attorney did not do his job, which is to get compensatory relief for the client.

This analysis is not altered merely because Wilkerson did not accuse appellants outright of unethical or unprofessional behavior. In *Nash*, an attorney brought an action for libel based on statements made which he argued suggested he

dishonestly worded retractions released in the course of his representation of certain school districts. The court stated, "While the defamatory language does not in express terms charge the plaintiff with a breach of his professional honor, yet, when aided by the inneundo [sic], operating within the scope of its legitimate functions, it does impute conduct tending to injure him in his profession." *Id.* at 458, 93 S.E.2d at 460 (internal citations omitted).

The facts of *Handelman v. Hustler Magazine, Inc.*, 469 F.Supp. 1048 (S.D.N.Y.1978), are very similar to the instant case. There, the plaintiff was the attorney for the executor of an estate. In an article written in the defendant magazine regarding the estate, the following sentence appeared: "Loeb [deceased's son] . . . fought the will for about six years, *letting high-priced New York lawyers eat up over $800,000.* [sic] before withdrawing his complaint, leaving his daughter to pay taxes on the rest." *Id.* at 1049 (emphasis added). According to the plaintiff, $800,000 represented eighty per cent of the estate. The trial court found this statement could be read to imply that the plaintiff charged an excessive or exorbitant fee, imputing to plaintiff "conduct which is incompatible with the standards of an ethical lawyer." *Id.* at 1051.

At the summary judgment hearing, appellants presented the deposition of the Cayce resident who informed appellant White of the broadcast. Regarding the contents of the broadcast, the resident stated, "Well, if I'm remembering correctly, it had something on the tape about the lawyer involved kept all of the money from one particular settlement. And usually lawyers keep a portion, but they give some to the client."

 We find the trial judge erred in finding Wilkerson's statements incapable of having a defamatory meaning.[1]

---

1. The state of defamation law in South Carolina is not entirely clear or settled. The issues addressed in this footnote are based on the law as suggested by current cases.

 With that in mind, we do agree with the trial judge's finding that the statements were not defamatory *per se*. A statement is defamatory *per se*, or on its face, if its defamatory meaning is apparent from the language itself. It must be susceptible of only one meaning, that being a defamatory one. If an innocent construction can fairly be made of the statement, it cannot be defamatory *per se*. *Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 312 S.E.2d 405, *cert. denied,* 469 U.S.

## II. Qualified Privilege

Appellants argue the trial judge erred in finding WMHK was protected by a qualified privilege because WMHK exceeded any privilege it may have had. The "fair report" privilege protects fair and accurate reports of "judicial records and proceedings and other official acts, reports, and records." S.C.Jur. *Libel and Slander* § 61 (1993) (footnote omitted).[2] *See also Jones v. Garner*, 250 S.C. 479, 158 S.E.2d 909 (1968). We affirm this issue pursuant to Rule 220(b)(1), SCACR.[3]

---

858, 105 S.Ct. 187, 83 L.Ed.2d 121 (1984). *See also Sandifer v. Electrolux Corp.*, 172 F.2d 548 (4th Cir.1949) (when words are clear and unambiguous, their character as defamatory is a question of law for the judge; however, when language is susceptible of two meanings, one slanderous and the other innocent, it must be left to the jury to determine from all of the circumstances attending the publication in what sense the defendant used them); *Wardlaw v. Peck*, 282 S.C. 199, 318 S.E.2d 270 (1984). Conversely, if it is necessary to refer to facts or circumstances beyond the language itself in order to make the defamatory meaning of the statement clear, it is defamatory *per quod*. We find that the statements at issue could be innocently construed and thus were defamatory *per quod*.

Finally, we disagree with respondents' arguments that the complaint only alleged the statements were defamatory on their face. While the complaint does use the term "defamation *per se*," appellants maintain they intended the phrase to allege the statements were actionable *per se* (meaning that if defamatory, the statements are presumed injurious without proof of malice or special damages). The significance of this is that if a statement is actionable *per se*, its defamatory meaning may be proven by the language itself or by reference to extrinsic facts (i.e. it may be defamatory *per se* or *per quod*). Noting the confusion in our case law regarding proper terminology in defamation cases, we accept appellants' contention and find they properly have alleged the statements are actionable *per se*. *See* S.C. Juris. *Libel and Slander* § 3 (1993) (acknowledging that the phrase "defamation per se" has been used in two different ways in South Carolina case law: one to mean a statement defamatory on its face; the other to mean a statement actionable without proof of malice and damages). *See also Pierce v. Northwestern Mut. Life Ins. Co.*, 444 F.Supp. 1098 (D.S.C.1978) (allegedly slanderous statement, in order to be actionable *per se*, must impute (1) commission of crime of moral turpitude, (2) contraction of loathsome disease, (3) adultery, (4) unchastity, or (5) *unfitness in one's business or profession*).

2. Appellants did not appeal the issue of whether Wilkerson's statements constitute an official act of the nature necessary to give rise to this privilege.

3. Regarding WMHK's assertion it is entitled to other privileges under

AFFIRMED IN PART, REVERSED IN PART AND RE-MANDED.

FINNEY, C.J., and TOAL, MOORE and BURNETT, JJ., concur.

the First Amendment, and its argument concerning the issue of fault, we decline to address these because they were not ruled on by the trial court. *Pamplico Bank and Trust Co. v. Prosser,* 259 S.C. 621, 193 S.E.2d 539 (1972).