# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Jeffrey Lance Cruce, Petitioner,

v.

Berkeley County School District, Respondent.

Appellate Case No. 2021-001520

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Berkeley County
The Honorable Kristi Lea Harrington, Circuit Court
Judge

---

Opinion No. 28186
Heard April 19, 2023 – Filed January 17, 2024

---

## REVERSED

---

Lucy Clark Sanders and Nancy Bloodgood, both of
Bloodgood & Sanders, LLC, of Mt. Pleasant, for
Petitioner.

E. Brandon Gaskins, of Moore & Van Allen, PLLC, of
Charleston; Richard J. Morgan, of Burr & Forman LLP,
of Columbia; and Andrew F. Lindemann, of Lindemann
Law Firm, P.A., of Columbia, all for Respondent.

---

**JUSTICE HILL:**  Petitioner Jeffrey L. Cruce became the head football coach and athletic director for Berkeley High School in 2011.  For the 2015 season, he adopted a controversial "no punt" offensive scheme for the football team.  This strategy stirred intense debate among followers of the team and was covered in local and even national sports pages.  The controversy deepened as the team suffered lopsided defeats. In December 2015, the Deputy Superintendent of the Berkeley County School District (the District) sent Cruce a letter advising him he was being relieved as coach and athletic director and reassigned to a position as a middle school guidance counselor because he had failed to meet certain performance goals.  The District never revealed the reason for Cruce's reassignment to the public.  Cruce requested the District reconsider his reassignment.

On January 7, 2016, Berkeley High athletic trainer Chris Stevens sent an email to forty-five people, including administrators, athletic department employees, and volunteer coaches, questioning the integrity and completeness of student athlete files Cruce had maintained.  In the email, Stevens remarked the filing issues were a potential "liability" to the District.

On January 8, the District Superintendent sent Cruce a letter upholding his reassignment.  Although Cruce completed the rest of the year at the middle school, he resigned at the end of the school year, noting in his resignation letter how the District had humiliated him and destroyed his career by removing him from his coaching and athletic director positions without any public explanation.

Cruce and his wife sold their home and moved out of state.  He contended he could not find a suitable coaching job–or even a position as a volunteer coach–because of the District's actions.

Cruce later brought this lawsuit against the District, alleging wrongful termination and defamation.  His defamation claim was based on several things, including Stevens' email.  The trial court granted the District a directed verdict on Cruce's wrongful termination claim.  The trial court also granted the District a directed verdict as to his defamation claim, except the portion of the claim related to Stevens' email.  In sending the defamation claim based on Steven's email to the jury, the trial court rejected the District's contention that Cruce was required to prove actual malice, ruling Cruce was not a public figure.

The jury awarded Cruce $200,000 in actual damages.  The District appealed.  The court of appeals reversed, holding Cruce was a public official for purposes of defamation law and the District was therefore entitled to immunity because

§15-78-60(17) of the South Carolina Tort Claims Act (2005) (SCTCA) immunizes the District from losses caused by employee conduct amounting to "actual malice."

We granted Cruce's petition for a writ of certiorari to address the issue of whether Cruce was a public official or public figure.

## I.     Public Official

According to the court of appeals, Cruce was a public official due to his status as a high school football coach and athletic director.   If deemed a public official, Cruce would be required to prove constitutional actual malice as articulated by *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964), to prevail on his defamation claim, and that requirement inherently bars his claim because the SCTCA grants the District immunity from loss arising from employee conduct constituting actual malice.  § 15-78-60(17).

Whether Cruce was a public official for purposes of defamation law is a question of law for the court to decide.  *Erickson v. Jones Street Publishers, LLC*, 368 S.C. 444, 468, 629 S.E.2d 653, 666 (2006).

The precedent dealing with the definition of "public official" is imprecise, but "it cannot be thought to include all public employees."  *Hutchinson v. Proxmire*, 443 U.S. 111, 119 n.8 (1979) (noting the Supreme Court "has not provided precise boundaries for the category of 'public official'").  The lead decision on the issue holds that the public official category applies "at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of government affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).  To qualify as a public official, the plaintiff must occupy a position that "would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in the controversy."  *Id*. at 86 n.13.  Put another way, the position must be one that attracts public scrutiny above and beyond that of the rank and file government job, such that "the public has an independent interest in the qualifications and performance of the person" holding the position.  *Id*. at 86.

In deciding whether someone is a public official in the defamation context, it is helpful to keep in mind the reason behind the classification: to apply the actual malice standard only where society's strong interest in free and open public debate about public issues outweighs the individual's important interest in protecting his reputation.  The right to protect one's reputation, a vital strand of our national history, "reflects no more than our basic concept of the essential dignity and worth of every

human being–a concept at the root of any decent system of ordered liberty." *Id*. at 92 (Stewart, J., concurring).

We have considered the public official designation in numerous defamation cases. *See, e.g.*, *Goodwin v. Kennedy*, 347 S.C. 30, 45, 552 S.E.2d 319, 327 (Ct. App. 2001) (assistant high school principal not a public official); *Erickson*, 368 S.C. at 471, 629 S.E.2d at 668 (private guardian ad litem not public official); *Miller v. City of West Columbia*, 322 S.C. 224, 228–29, 471 S.E.2d 683, 685–86 (1996) (assistant police chief deemed public official); *McClain v. Arnold*, 275 S.C. 282, 284, 270 S.E.2d 124, 125 (1980) (police officer deemed public official); *Anderson v. The Augusta Chronicle*, 365 S.C. 589, 592, 594–95, 619 S.E.2d 428, 429, 431 (2005) (candidate for state office deemed public official); *Fleming v. Rose*, 350 S.C. 488, 494, 567 S.E.2d 857, 860 (2002) (state trooper deemed public official); *see generally* Hubbard and Felix, *The South Carolina Law of Torts* 611 (5th ed. 2023).

We have not, however, confronted whether a high school football coach or athletic director is a public official in the defamation context. The District insists Cruce is a public official, pointing to his public employment and the enormous array of newspaper articles cluttering the record that were written about him and his unorthodox coaching strategies, as well as his appearances in other media, including a regular radio show.

We understand Cruce was a public employee and enjoyed media attention akin to that of many sports figures. But that does not transform him into a public official, a classification that would strip him of his right to protect his name from being defamed to the same extent as a private citizen. No matter how intense the public gaze may be upon sports figures, they do not have any official influence or decision-making authority about serious issues of public policy or core government functions, such as defense, public health and safety, budgeting, infrastructure, taxation, or law and order. It is these public issues and functions that the First Amendment recognizes as so essential to democracy that public debate about them and their policymakers should be unchecked, except where the speech is knowingly false or uttered with reckless disregard of its truth or falsity, i.e. the "actual malice" standard of *New York Times v. Sullivan*.

As *New York Times v. Sullivan* explained, the actual malice rule protects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." 376 U.S. at 270. Fielding a football team or devising an offensive strategy is not the type of public issue envisioned by the Framers of the First Amendment. Baseball may be the national pastime, but it and other sports are just that: pastimes. They are not forums for civic concerns, and

sports figures–regardless of how far and wide their fame may spread–are not public officials. In holding that a high school basketball coach was not a public official, the Utah Supreme Court summed things up well:

> We view the constitutional standard for public official announced by the Supreme Court to be limited to those persons whose scope of responsibilities are likely to influence matters of public policy in the civil, as distinguished from the cultural, educational, or sports realms . . . . Nor is celebrity, for good or ill, of the government employee particularly relevant. Rather, it is the nature of the governmental responsibility that guides our public official inquiry. The public official roster is comprised exclusively of individuals in whom the authority to make policy affecting life, liberty, or property has been vested . . . . The policies and actions of the coach of any high school athletic team does not affect in any material way the civic affairs of a community—the affairs most citizens would understand to be the real work of government.

*O'Connor v. Burningham*, 165 P.3d 1214, 1219 (Utah 2007); *see also McGuire v. Bowlin*, 932 N.W.2d 819, 825–28 (Minn. 2019) (holding high school basketball coach was not a public official; although coach was public employee, "his coaching duties are ancillary to core functions of government; put simply, basketball is not fundamental to democracy").

We therefore hold Cruce was not a public official. Consequently, we reverse the decision of the court of appeals. In fairness, the court of appeals conclusion that Cruce was a public official understandably relied on *Garrard v. Charleston County School District.*, which held a high school football coach was a public official. We have since vacated that portion of *Garrard*. 429 S.C. 170, 209–10, 838 S.E.2d 698, 719 (Ct. App. 2019), *aff'd in part, vacated in part sub nom, Garrard for R.C.G. v. Charleston County School District*, Op. No. 28155 (S.C. Sup. Ct. filed May 31, 2023) (Howard Adv. Sh. No. 31).

## II.    Limited Public Figure

The District's backup argument is that, if Cruce is not a public official, then he is a public figure. The District relies on *Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967), which held that the head football coach at the University of Georgia (who was privately paid and not a public employee) was a "public figure" in a defamation case involving allegations of bribery. Cruce could not be an all-purpose "public figure" as that term of art from *Butts* was later clarified as limited to those who "have assumed roles of especial prominence in the affairs of society . . . [or] occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Nor is he that unicorn of defamation law, the "involuntary public figure," a species *Gertz* described as "exceedingly rare," and some now believe to be extinct. *Id*; *see generally* Elder, *Defamation: A Lawyer's Guide* § 5.8 (Oct. 2022).

Nevertheless, the District claims Cruce fits the definition of a limited public figure, a category announced in *Gertz* that describes one who "voluntarily injects himself or is drawn into a particular controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351; *see also id*. at 345 (explaining that limited public figures "invite attention and comment" because they "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved"). The rationale for requiring limited public figures to prove actual malice is that such persons have not only assumed the risk by voluntarily entering the forefront of a public controversy where it is essential that speech be unbridled, but they also have superior access to media outlets to defend themselves and express counter speech. *See Gertz*, 418 U.S. at 344. The idea is that by stepping into the bully pulpit of public debate, one must expect to endure the slings and arrows of outrageous (but not knowingly or recklessly false) statements hurled in the hurly burly of civic discourse. To paraphrase Justice Brandeis, the patriots who fought to found our country were not cowards; they did not fear political battle and knew that freedom to speak out against the government was the oxygen of democracy; they were aware, through bitter experience, that the stifling of speech was a preferred weapon of tyranny because it replaces tolerance with repression, producing a climate of fear, anger, and apathy that can topple republics. *See Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J. concurring).

In *Erickson*, we adopted a five factor test for determining whether one is a limited public figure. 368 S.C. at 474, 629 S.E.2d at 669 ("In order for the court to properly hold that a plaintiff is a public figure for the limited purpose of comment on a particular public controversy, the defendant must show: (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence

the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation."). According to the District, the trial court erred in concluding Cruce did not meet the *Erickson* test.

We borrowed the *Erickson* test from the Fourth Circuit. As that court has explained, before applying the test, a court must decide the threshold issue of whether a genuine public controversy exists. *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001). A public controversy is not merely a dispute that has garnered publicity. It must be a controversy about civic issues of concern to the public as a whole (or at least a broad segment of it), not just the participants in the dispute and their supporters, no matter how fanatic they may be. *See id.* at 279 (stating term "public controversy" does not encompass every conceivable issue of interest to the public, only a dispute that has received public attention because its ramifications affect even members of the public not participating in the dispute). This is, we think, consistent with *Gertz*'s description of public figures as persons who "assume special prominence in the resolution of public questions." 418 U.S. at 351; *see also Time, Inc. v. Firestone*, 424 U.S. 448, 453–55 (1976) (refusing to designate wealthy divorcee as limited public figure despite her celebrity and widespread notoriety).

The *Erickson* template is well-intentioned but awkward to apply. We believe a better test for determining whether one is a limited public figure considers three things: (1) whether the plaintiff voluntarily injected herself into and played a prominent role in a public controversy, defined as a controversy whose resolution affects a substantial segment of the public; (2) whether the defamation occurred after the plaintiff voluntarily entered the controversy but while still embroiled in it; and (3) whether the defamation was related to the controversy. *See Prosser and Keeton on Torts* 806 (W. Page Keeton et al. eds., 5th ed. 1984); *The Law of Torts* § 561 (Dan B. Dobbs et al., 2d ed., 2011); Smolla, *1 Law of Defamation* §§ 2:23 & 2:24 (2d ed., 2023). We therefore replace the *Erickson* factors with this three-part inquiry.

We conclude Cruce is not a limited public figure under this test or *Erickson*. First, no public controversy was present. The merit of Cruce's coaching strategy was not a controversy that affected large segments of society. Second, even if a public controversy existed over Cruce's coaching strategy, Stevens' defamatory comments related to Cruce's paperwork skills, not his gridiron acumen. *See Bowlin*, 932 N.W.2d at 829 (even if high school coach's tactics were subject of public controversy, alleged defamation related to claims of improper conduct towards players).

### III. Remaining Elements of Cruce's Defamation Claim

Because we have held Cruce was neither a public official, nor a public figure, we must address the District's argument that the jury's damages verdict should nevertheless be set aside because Cruce failed to prove the content of Stevens' email was defamatory, Cruce failed to prove Stevens acted with common law malice in writing and sending the email, and Cruce failed to prove the email proximately caused his damages. We will take up each of these arguments in turn, mindful that because we are reviewing the trial court's denial of the District's judgment not withstanding the verdict (JNOV) motion, we must construe the evidence in the light most favorable to the non-moving party, we may not weigh the credibility of the evidence, and we must uphold the trial court's ruling if it is supported by any evidence. *Curcio v. Caterpillar*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003).

Our analysis begins by recognizing that to prevail on a defamation claim brought by a private figure against a non-media defendant related to a private concern, Cruce bore the burden of proving the District or its agent published a defamatory and unprivileged statement about him to others; that the District was at fault (in the sense it was at least negligent); and that either general damages are presumed from the statement or the publication caused the plaintiff special harm. *Cf. Erickson*, 368 S.C. at 465, 629 S.E.2d at 664; *see generally Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 506 S.E.2d 497 (1998) (*Holtzscheiter II*).

A. Defamatory Meaning and Proof of Falsity

We take up the defamatory content argument first. A statement is defamatory if it tends to harm one's reputation so as to lower him in the esteem of his community or deter others from dealing or associating with him. *Fleming v. Rose*, 350 S.C. at 494, 567 S.E.2d at 860. A statement may be deemed non-defamatory as a matter of law only if it is incapable of being interpreted as defamatory by any reasonable construction. *Fountain v. First Reliance Bank*, 398 S.C. 434, 443, 730 S.E.2d 305, 310 (2012). Whether a statement is defamatory is initially a question of law for the court. *White v. Wilkerson*, 328 S.C. 179, 183, 493 S.E.2d 345, 347 (1997).

We conclude a reasonable person who received Stevens' email could read it as suggesting Cruce's filing and management skills were incompetent. In the email, Stevens states that essential information from the student athlete files "could" be missing, posing a potential "liability" for the District. The District seizes upon Stevens' hedging and contends that because Stevens never directly stated Cruce had done anything improper, he did not defame Cruce. Our role, however, is to interpret the words fairly and in their natural sense. *Timmons v. News & Press, Inc.*, 232 S.C. 639, 644, 103 S.E.2d 277, 280 (1958). A rational reader of Stevens' email could conclude that it was communicating information suggesting Cruce was incompetent

and unfit to perform the administrative duties of his position. *See Johns v. Amtrust Underwriters, Inc.*, 996 F.Supp.2d 413, 418–19 (D.S.C 2014) (derogatory comment made by auditor of plaintiff's work files was defamatory per se because it could be interpreted that plaintiff was unfit for job). The "liability" buzzword added a suggestion of not just incompetence but illegality. Because the email was susceptible of a defamatory meaning, the trial court did not err in submitting the issue to the jury and denying the District's JNOV motion. *White*, 328 S.C. at 183–84, 493 S.E.2d at 347.

The District argues that because the statements in Stevens' email could be read as non-defamatory, the trial court should have declared them so and granted JNOV to the District. The District is in essence trying to resurrect the ancient doctrine of *mitior sensus* ("gentler sense"), which held that if words may be construed as either defamatory or not, the court must give them the non-defamatory meaning as a matter of law. *Wardlaw v. Peck*, 282 S.C. 199, 203, 318 S.E.2d 270, 273 (Ct. App. 1984) (discussing doctrine). English courts cast the doctrine off by the early 18th century, and we inherited that common law by the reception statute. *Id*. We have since directly rejected the doctrine, most famously in Judge O'Neall's decision in *Davis v. Johnston*, 185 S.C.L. 579, 579–80 (1832), and most recently in Judge Bell's comprehensive opinion in *Wardlaw*, both of which we reaffirm today. *See generally* Eldredge, The Law of Defamation § 24 at 161 (criticizing the doctrine as "peculiar" and one that would allow defamers to destroy another's reputation and escape liability by phrasing the defamatory statement in such a way that it can also be interpreted as an innocent comment).

The District alternatively argues there was no evidence Stevens' comments about the files were false. The common law presumed a defamatory statement to be false. *See Pierce v. Inter-Ocean Cas. Co.*, 148 S.C. 8, 145 S.E. 541, 543 (1928) ("[T]he falsity of defamatory matter is presumed . . . ." (citation removed)); *Parrish v. Allison*, 376 S.C. 308, 327, 656 S.E.2d 382, 392 (Ct. App. 2007) ("A defamatory communication is presumed to be false under the common law. The plaintiff does not have the burden of proving falsity. However, truth can be asserted as an affirmative defense, the burden of which is on the defendant."). Whether the First Amendment requires our state common law to include falsity as an element of the tort of defamation in cases brought by a private plaintiff against a non-media defendant in matters of private concern has not been resolved and is not an issue raised by the parties here. *See* Smolla, 1 *Law of Defamation* § 5:11 (2d ed. 2023); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 429 (1985); Restatement (Second) of Torts § 581A, comment b. (1977).

We note the jury was instructed, without objection, that truth was a defense, not an element of the defamation claim. The case was therefore tried on the theory that truth was an affirmative defense. There is abundant evidence in the record the jury could have used to find Stevens' email contained false statements about the content of the files. Cruce testified that the files and record keeping had recently passed a state audit. He also testified Stevens' statements in the email about what content was required in student athlete files was incorrect and "fraudulent."

### B. Common Law Malice

Next, we address the District's claim that Cruce failed to prove Stevens acted with common law malice, which we have defined in defamation cases as including statements made with such recklessness as to show conscious disregard of another's rights. *Holtzscheiter II*, 332 S.C. at 519 n.3, 506 S.E.2d at 506 n.3. The record here demonstrates Stevens could have been reckless. There was testimony indicating Stevens was not authorized to review student athlete files, nor was he trained to know the applicable requirements. Still, he rummaged through the files and broadcast his belief about their integrity to forty-five of Cruce's peers. After declaring the files were incomplete or out of order, he reported he would continue reviewing them over the next few days "to make sure the correct files are in place." This remark shows Stevens' review of the files before sending the email was cursory and incomplete. In short, there was sufficient evidence of recklessness to withstand a JNOV motion.

We should point out that the trial court charged the jury that Cruce had to prove common law malice. Cruce initially objected to this charge, correctly arguing that because the defamation involved libel, Cruce was relieved of the burden of proving common law malice and general damages would be presumed. *See Holtzscheiter II*, 332 S.C. at 510–11, 506 S.E.2d at 525–27. The trial court overruled Cruce's objection. Because this issue was not appealed, it is not before us.

### C. Proximate Cause

At trial, Cruce relied on the concept of general damages. General damages in a libel case are those that one suffers by being defamed: the embarrassment, humiliation, and emotional suffering resulting from the loss of one's reputation. *See Kunst v. Loree*, 424 S.C. 24, 45, 817 S.E.2d 295, 306 (Ct. App. 2018) (explaining defamation focuses on injury to reputation, not to one's feelings). The jury was charged Cruce bore the burden of proving his reputation was damaged by the defamation. It was also instructed, consistent with controlling law, that a defamatory statement is one that "tends to attack the honesty, integrity, virtue, or reputation of a person and

exposes the person to disgrace, public hatred, avoidance, contempt or ridicule." The jury was further charged that Cruce could not recover speculative damages, but only those proximately caused by the defamation, and that the nature of some of those damages defied objective "monetary value."

Viewing the evidence most favorably to Cruce, as we must, we conclude the jury's damages award must be upheld. Cruce testified as to his humiliation, how his reputation was ruined due to the District's conduct towards him, how he could not find another job in coaching, that he was "shunned," and that there was a "black mark" on his name. Cruce's wife testified her husband was affected emotionally.

The District contends Cruce did not link any of these damages directly to Stevens' email. According to the District, Cruce's damages evidence related to the District's dismissal of him as coach and athletic director. Because the trial court granted the District a directed verdict on Cruce's defamation claim except as to Stevens' email, the District claims no evidence exists to support the jury's damages award.

We disagree. The jury heard Cruce's damages evidence. Like most general damage evidence in defamation cases, it was, well, general. Reputational damages are intangible and notoriously hard to pinpoint and quantify, a reality the law has long recognized. We could dissect the record and perhaps conclude Cruce did not flatly state precisely how Stevens' email humiliated him or caused his wife to believe it had, as she said, knocked him off his emotional "footing." But to do so, we would have to ignore our duty under the governing standard of review for JNOV rulings to consider the evidence in the light most favorable to Cruce and construe all reasonable inferences and ambiguities in his favor. *See Curcio*, 355 S.C. at 320, 585 S.E.2d at 274.

The jury's general verdict found the email defamed Cruce. Implicit in that finding is the recognition that the email damaged Cruce's reputation. There was enough evidence to support the jury's further implicit findings as to proximate cause and the damages amount. *See Welch v. Epstein*, 342 S.C. 279, 300–01, 536 S.E.2d 408, 419 (Ct. App. 2000) (denying JNOV and noting a "jury's verdict will not be overturned if any evidence exists that sustains the factual findings implicit in its decision").

## IV.   Conclusion

We reverse the decision of the court of appeals and hold Cruce was not a public official or a limited public figure. Cruce's defamation claim was supported by the evidence. We therefore reinstate the jury's damages award.

**REVERSED.**

**BEATTY, C.J., and KITTREDGE, J., concur. JAMES, J., concurring in part and dissenting in part in a separate opinion, in which FEW, J. concurs. FEW, J. dissenting in a separate opinion.**

**JUSTICE JAMES:** I agree with the majority that Mr. Cruce was not a public official or public figure (limited or otherwise). However, I disagree with the majority that Stevens' email could reasonably be construed as defamatory. Therefore, I concur in part and dissent in part and would reverse the trial court's denial of the District's motion for JNOV.

As athletic director, Cruce was responsible for maintaining student-athlete eligibility files. In December 2015, Cruce was removed as athletic director head and football coach and was reassigned to a position as a guidance counselor at a middle school in the District. Chris Stevens was the head athletic trainer at Berkeley High School. During Christmas break of the 2015-16 school year—after Cruce had been relieved of his athletic director and coaching duties—strength coach Mike Ward asked Stevens about the status of the eligibility files of students playing winter sports. Stevens testified he had been in athletic training since 2010 and had experience with and knowledge of records that had to be in the files. On January 7, 2016, Stevens, Ward, and an assistant principal went into Cruce's former office and examined the files for students who were weightlifting to make sure the students were medically cleared to be in the weight room. After reviewing the files, Stevens sent the subject email to forty-five recipients connected with athletic programs in the District. The email read as follows:

> Today, January 7th 2016, myself, coach Ward, and Mr. Gallus went into the athletic director[']s office to check on the status of the student files left by our previous athletic director. After spending some time looking through files it has come to my attention that there could be some documents that could be misplaced and others that are out of order. From a liability stand point with competing sports and athletes it is necessary that all of the files be present to safeguard the athletes as well as to maintain the proper care for those athletes if something were to happen.

> I will be in the AD's office during the next few day[s] to make sure the correct files are in place for competing athletes and those weightlifting after school to make sure EVERY child has the correct paperwork on file.

> I would ask if you have athletes competing and/or conditioning at the present time, this includes weightlifting, that you send me a copy of that roster ASAP so that I can check your student-athletes off the "no-fly" list. ALL students MUST have the following files in order to participate in scholastic sports:

> - Risk Acknowledgment and Consent to Participate form
>
> - Pre-participation Physical Examination form (signed by a doctor)
>
> - Proper understanding of HIPAA and FERPA rights
>
> - Emergency Insurance Information and Consent to Treat form
>
> - ANY special accommodations such as asthma, allergies etc. must have a written Doctor's note filed and must have necessary treatment (Inhaler, Epi-pen) present at all times.
>
> - Copies of Birth Certificate and Social Security Cards.
>
> I will update everyone again next week once everything has been checked off. Thank you in advance for your cooperation.

As the majority notes, whether a published statement is defamatory is in the first instance a question of law for the court. *See White v. Wilkerson*, 328 S.C. 179, 183, 493 S.E.2d 345, 347 (1997) ("It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning." (citing *Pierce v. Northwestern Mut. Life Ins. Co.*, 444 F.Supp. 1098 (D.S.C. 1978))). The statement may be deemed non-defamatory as a matter of law only if it is incapable of being interpreted as defamatory by any reasonable construction. *See Fountain v. First Reliance Bank*, 398 S.C. 434, 443, 730 S.E.2d 305, 310 (2012) (citing *Adams v. Daily Tel. Co.*, 292 S.C. 273, 279, 356 S.E.2d 118, 122 (Ct. App. 1986)).

The majority concludes that "a reasonable person who received Stevens' email could read it as suggesting Cruce's filing and management skills were incompetent" and that Cruce "was incompetent and unfit to perform the administrative duties of his position." I disagree. Such a mild critique of Cruce's paperwork skills is not in any sense defamatory. The majority also concludes "the 'liability' buzzword" adds a suggestion of "illegality." I disagree. The use of the term "liability" suggests no such thing.

I would hold the email is not defamatory under any reasonable construction. Therefore, I would reverse the trial court's denial of the District's motion for JNOV and enter judgment for the District.

**FEW, J., concurs.**

**JUSTICE FEW:** I respectfully dissent. I agree with Justice James's opinion that the one email was—as a matter of law—not defamatory. Thus, I would not reach the question whether Cruce was a public figure or a public official. I would affirm the court of appeals because it reached the correct result. *See* Rule 220(c), SCACR (stating we "may affirm any ruling . . . upon any ground[] appearing in the Record on Appeal").

I respectfully disagree with the majority on one other point. For reasons not explained by the majority, nor addressed in the briefs of the parties, nor mentioned at oral argument, the majority changes the words of our *Erickson* test for when a person becomes a limited public figure. The majority's proposed change is not substantive and will not affect the outcome of any cases. While it is always beneficial for courts to attempt to better articulate law we use to decide cases, this particular "change" accomplishes nothing. Thus, I see no reason for this Court to change the words of the *Erickson* test.